Filed 6/25/13  P. v. Hayes CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060781 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 290952) |
| BRANDON ALLEN HAYES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Jerome P. Wallingford for Defendant and Appellant Brandon Hayes.

David M. McKinney for Defendant and Appellant Jeffrey Carl Reed.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

In October 2009, the People charged Brandon Allen Hayes and Jeffrey Carl Reed with several offenses related to the May 16, 2009 murder of Hayes's grandmother, Eunice Cothron. The People charged Hayes and Reed with murder (Pen. Code, § 187, subd. (a))[1] (count 1), first degree robbery (§§ 211, 212.5) (count 2), first degree burglary (§§ 459, 460) (count 3), and carjacking (§ 215, subd. (a)) (count 4). As to count 1, with respect to each defendant, the People alleged two special circumstances, namely that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)), and during the commission of a burglary (§ 190.2, subd. (a)(17)). In addition, as to counts 1, 2, 3, and 4, the People alleged that Hayes personally used a deadly weapon, within the meaning of section 12022, subdivision (b)(1). The information also alleged that on or about April 11, 2009, Hayes had unlawfully taken and driven Cothron's vehicle (Veh. Code, § 10851, subd. (a)) (count 6). Finally, the information alleged that Hayes had served two prior prison terms within the meaning of sections 667.5, subdivision (b) and 668, and that Reed had suffered a prior serious felony conviction (§§ 667, subd. (a)(1), 1192.7, subd. (c)), and a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12.)

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

The trial court held a joint trial on counts 1 through 4, with a separate jury for each defendant.[2] The Hayes jury found Hayes guilty of counts 1 through 3, and found true the two special circumstances alleged with respect to count 1. The jury found Hayes not guilty of count 4 and returned not true findings on the deadly weapon allegations. The Reed jury found Reed guilty of counts 1 through 4, and returned a true finding on each of the two special circumstances alleged with respect to count 1. In bifurcated proceedings before the court, Hayes admitted having served the prior prison terms and Reed admitted having suffered the serious felony conviction and strike conviction.

The court sentenced Hayes to life without the possibility of parole on count 1 (§§ 187, subd. (a), 190.2, subd. (a)(17)) (first degree murder with special circumstances). The court also sentenced Hayes to a three-year term on count 6 (Veh. Code, § 10851, subd. (a)) (unlawful taking of a vehicle), and two one-year terms for the two prison priors (§ 667.5, subd. (b)), all to be served consecutively to the indeterminate term. The court stayed execution of the sentences on the remaining counts pursuant to section 654.

The court sentenced Reed to life without the possibility of parole on count 1 (§§ 187, subd. (a), 190.2, subd. (a)(17)) (first degree murder with special circumstances), plus an additional five years to be served consecutively for the serious felony prior (§ 667, subd. (a)(1)). The court also sentenced Reed to five years on count 4 (§ 215, subd. (a)) (carjacking) to be served concurrently with the indeterminate sentence on count 1, and stayed the execution of the sentences on the remaining counts pursuant to section 654. The

---

[2] Prior to the jury trial, Hayes pled guilty to count 6.

court struck Reed's prior strike (§§ 667, subds. (b)-(i), 1170.12, 668) in the interest of justice (§ 1385).

On appeal, each defendant raises several claims of error. We conclude that the trial court committed no reversible error and affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The People's evidence*

1. *The days prior to the murder*

Hayes met Reed on May 5, 2009, while the two were staying at an inpatient drug and alcohol detoxification facility. On May 13, Hayes and Reed decided to leave the facility together.

2. *The night before the murder*

On May 16, at approximately 4:30 in the morning, San Diego County Deputy Sheriff Thomas Fletcher encountered Hayes and Reed at a gas station located near the victim's residence, in Alpine, California. Because the two looked suspicious, Deputy Fletcher made contact with them and conducted a field interview of Reed and Hayes.

During a consensual search, Deputy Fletcher retrieved a knife with a four-inch blade from Hayes's pocket. Fletcher also recalled observing a pair of leather gloves, a head-mounted light and a glass cutting tool inside Hayes's backpack. After the search, Fletcher returned the knife and the other items to Hayes. Fletcher also conducted a records search and learned that there was an unserved temporary restraining order prohibiting Hayes from having contact with Cothron or being in the vicinity of her residence. Fletcher served the

4

restraining order on Hayes. After Fletcher served the restraining order, Hayes asked Fletcher how he would be able to retrieve belongings that were at Cothron's residence. Fletcher told Hayes that he would have to have a third party retrieve the items.

3.    *The murder and related offenses*

At approximately 7:50 a.m. that same morning, Cothron telephoned her daughter and told her that a man had come to her front door and asked for Hayes's birth certificate. Cothron told the man that she did not have the birth certificate.

At some time just prior to 9:30 a.m., Hayes and Reed entered the victim's residence. Hayes strangled Cothron to death, and Hayes and Reed stole money, jewelry and the victim's credit card from the residence. The pair fled in Cothron's car.

4.    *Postmurder events*

Hayes and Reed disposed of two knives taken from the victim's residence and Hayes's own knife on an embankment on the side of a nearby road. Hayes and Reed then went to a mall where they purchased some items. From the mall, Hayes drove Reed to a parking lot near the international border. After parking the car, the two walked into Mexico. Surveillance video captured Hayes and Reed at the mall and crossing the border.

While in Mexico, Hayes and Reed went to a strip club together. Hayes paid one of the dancers to have sex with him and offered her drugs and jewelry.

5

5.     *Physical evidence*

On May 16, at approximately 9:00 p.m., a family member discovered Cothron's body inside her residence, a few feet from her front door. Cothron had a bath towel stuffed in her mouth. Hayes's DNA was found on samples taken from the towel and from Cothron's fingernail scrapings.

Several dresser drawers in Cothron's bedroom had been ransacked. Jewelry, cash, and a credit card were missing.

On the kitchen floor, a family member found a business card with the name Carlos Terrones on it. Police determined that Reed's fingerprint was on the business card, as well as on a torn envelope found inside the residence. In an interview with law enforcement officers, Reed admitted that he had used the business card as part of a ruse to gain access into Cothron's residence. (See pt. II.A.7, *post.*)[3] During the interview, Reed also admitted having searched through envelopes inside Cothron's residence, looking for money.

Police found Hayes's fingerprint on a box located in the residence and on the exterior of Cothron's car. His DNA was found on the driver's seat and the steering wheel.

6.     *The victim's injuries and the cause of death*

Cothron had injuries to her neck and head, bruises on her lip and nose, and bruises on her arms and legs. A medical examiner concluded that Cothron died from strangulation. The medical examiner added that a person would have had to apply pressure to Cothron's neck for a few minutes to cause death.

---

[3]     Reed's jury viewed a video of his interview with law enforcement. Hayes's jury did not.

6

7.      *Motive evidence*

Hayes had a long-standing drug problem and was estranged from his family. Cothron had attempted to help Hayes with his difficulties, and had provided him with financial assistance. The two had a good relationship before Hayes stole Cothron's car in April 2009.[4] As a result of that theft, and Hayes's denial of having taken the car, Cothron obtained a restraining order against Hayes.

8.      *Reed's interview with law enforcement*[5]

A few days after the murder, Reed turned himself in to authorities at the border between the United States and Mexico. Detectives interviewed Reed shortly thereafter. After initially denying any involvement in the charged offenses, Reed made a series of admissions concerning his involvement. Reed told the detectives that he had gone to Cothron's residence earlier on the morning of the murder, at Hayes's request, to attempt to obtain Hayes's birth certificate. After Cothron told Reed that she did not have Hayes's birth certificate, he left to meet Hayes. The two of them returned to Cothron's residence together. According to Reed, as he and Hayes approached the residence, Hayes told Reed that Hayes intended to grab his birth certificate and some of Cothron's money and jewelry from inside the residence.

---

[4]     The parties stipulated that on July 13, 2011, Hayes pled guilty to the theft of Cothron's car. This conduct formed the basis of count 6.

[5]     As noted previously, only Reed's jury viewed the video recording of Reed's interview with law enforcement.

Reed told the detectives that when he and Hayes arrived at Cothron's front door, Reed had Terrones's business card in his hand and Hayes was holding a knife. Reed knocked on the front door while Hayes hid behind the door. As Cothron opened the front door, Reed handed her the business card, and began to speak to her. As Cothron took the card, Hayes opened the door further, rushed around Reed through the open door, and knocked Cothron to the floor. Hayes then got on top of Cothron and put his hands around her neck.

Reed stated that Hayes said to him, "Get the fuck in the house and shut the door." Reed entered the mobile home and shut the door. Once inside, Reed saw Hayes strangling Cothron and holding a knife near her neck. Reed told detectives that because he was so upset by what he was witnessing, he walked into another room of the residence and began to look for valuables to steal.

When Reed returned, the kitchen drawer was open and Hayes was still on top of Cothron with a different knife in his hand. According to Reed, he asked Hayes to stop, and Hayes told Reed to "Shut the fuck up." Reed said he did not intervene on the victim's behalf because Hayes had a knife in his hand and Reed was afraid that Hayes would kill him.

According to Reed, at some point during the incident, Reed grabbed an envelope that he found in Cothron's bedroom and opened it to see if there was money inside. Hayes ripped open two greeting cards, grabbed a jewelry box off of Cothron's dresser, and took Cothron's purse and car keys. Hayes and Reed put the items into Cothron's car and Hayes drove the two from the scene.

8

Reed said that as Hayes drove away, he told Reed that he had not killed Cothron and that she was just unconscious. Reed informed detectives that he and Hayes disposed of the knives, the purse, and the jewelry box in various locations near the freeway. Reed acknowledged that he and Hayes used the proceeds of the robbery and burglary to buy drugs in Mexico after the murder.

9. *Hayes's interview with law enforcement officers*[6]

Shortly after Reed turned himself in, authorities detained Hayes at the border. During an ensuing interview with law enforcement, Hayes repeatedly denied involvement in the charged offenses. Hayes told law enforcement officers that while he and Reed were in Mexico, the two were "going to bars, [and] strip clubs." Hayes also acknowledged that while he was in Mexico, he was spending money on "dope," "drinks," "hookers," and a hotel room.

B. *The defense*

Neither Hayes nor Reed testified or presented any evidence at trial. Hayes's counsel conceded that Hayes had killed Cothron. However, counsel argued that Hayes had acted without premeditation, and that "frustration," "anger," and Hayes's "drug addiction" had caused him to kill Cothron. Hayes's counsel argued further that Hayes did not form the intent to steal from Cothron until after he had killed her, and thus, that the jury should not find him guilty of felony-murder, and should not find the special circumstances to be true.

---

[6] Both juries viewed a video recording of Hayes's interview with law enforcement officers.

9

Reed's counsel argued that Reed had participated in the events under duress. Specifically, counsel argued that Hayes had displayed a knife outside the victim's residence in order to ensure that Reed assisted Hayes in committing the charged offenses.

III.

DISCUSSION

A.      *Hayes's Appeal*

1.      *The trial court did not abuse its discretion in denying Hayes's motions for complete severance; the trial court's decision to hold a single trial with dual juries did not result in gross unfairness*

Hayes claims that the trial court abused its discretion in denying his motions for complete severance. Hayes contends that he and Reed presented antagonistic defenses and that the "dual jury trial with Reed resulted in identifiable prejudice and gross unfairness."

a.      *Factual and procedural background*

Prior to trial, Reed requested several continuances of the trial. During hearings on Reed's requests, Hayes's counsel informed the court that Hayes was ready to proceed to trial. Hayes's counsel also orally requested that the trial court sever Hayes's trial from Reed's. In connection with one of Reed's requests for a continuance, the People filed a brief in which they argued that if the court were to grant any continuance, the continuance should be granted as to both defendants, and should not serve as a basis for severing Hayes's trial from Reed's.[7] The trial court denied Hayes's oral motions to sever, and granted Reed's requests to continue the case.

_____

[7]      The People cited section 1050.1, which provides:

10

In addition, prior to the trial, Hayes filed a written motion to sever. In his motion, Hayes argued that the trial court should sever his trial from Reed's for a number of reasons, including that Reed and Hayes might present antagonistic defenses[8] and that it would be unfair for members of Hayes's jury to hear Reed's counsel's cross-examination of the witnesses.

After a hearing on the motion to sever, the trial court denied the motion. The court noted that it had denied several prior motions to sever and that there was "abundant case law which support[s] a dual jury in this particular instance."

During the trial, Hayes's counsel objected to Reed's counsel's cross-examination of Deputy Fletcher concerning whether Hayes had told the deputy why Cothron obtained a restraining order against him. The trial court overruled the objection, and Deputy Fletcher testified that Hayes informed him that Cothron suspected Hayes of "stealing stuff." Outside the presence of the jury, Hayes's counsel stated that he objected to an "interloper" (Reed's

---

> "In any case in which two or more defendants are jointly charged in the same complaint, indictment, or information, and the court or magistrate, for good cause shown, continues the arraignment, preliminary hearing, or trial of one or more defendants, the continuance shall, upon motion of the prosecuting attorney, constitute good cause to continue the remaining defendants' cases so as to maintain joinder. The court or magistrate shall not cause jointly charged cases to be severed due to the unavailability or unpreparedness of one or more defendants unless it appears to the court or magistrate that it will be impossible for all defendants to be available and prepared within a reasonable period of time."

[8] Hayes's counsel stated, "It is believed that Mr. Reed will blame Mr. Hayes for the homicide and will attempt to minimize his own involvement."

counsel) asking questions in front of Hayes's jury, on the ground that this denied Hayes the right to a fair trial.

Later during the trial, Hayes's counsel objected to Reed's counsel's questioning of Hayes's father concerning an incident from Hayes's youth during which Hayes allegedly put some type of toxic foreign substance in his stepbrother's baby formula. Hayes moved for a mistrial and a severance on the ground that Reed's counsel was eliciting irrelevant and prejudicial information. Reed's counsel stated that this issue had been explored during the prosecutor's direct examination, without objection. The court overruled the objection, and did not grant a mistrial or severance.

b. *Governing law*

i. *The preference for joint trials*

In *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*), the Supreme Court outlined the strong preference for joint trials in cases involving defendants charged with the same crimes arising out of the same events:

> "Section 1098 expresses a legislative preference for joint trials. The statute provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' [Citation.] Joint trials are favored because they 'promote [economy and] efficiency' and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' [Citation.] When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial. [Citation.]"

12

ii.     *Factors that a trial court is to consider in ruling on a motion for severance*

The *Coffman* court discussed the factors that a trial court may examine in ruling on a motion for severance:

> "The court's discretion in ruling on a severance motion is guided by the nonexclusive factors enumerated in *People v. Massie* (1967) 66 Cal.2d 899, 917, such that severance may be appropriate 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Coffman*, *supra*, 34 Cal.4th at p. 40, fns. omitted.)

" 'Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." [Citations.]' " (*People v. Homick* (2012) 55 Cal.4th 816, 848 (*Homick*).)

iii.    *Antagonistic defenses*

The Supreme Court has explained that severance is rarely compelled merely because codefendants present antagonistic defenses. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner and Tobin*) [" 'If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case." ' [Citation.]" " ' "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." ' [Citation.]" (*People v. Souza* (2012) 54 Cal.4th 90, 111.) Further, it is well established that

13

where " 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do *not* compel severance.' [Citation.]" (*Letner and Tobin*, *supra*, at p. 150, italics added.)

        iv.    *The use of dual juries*

"The use of dual juries is a permissible means to avoid the necessity for complete severance. The procedure facilitates the Legislature's statutorily established preference for joint trial of defendants and offers an alternative to severance when evidence to be offered is not admissible against all defendants. [Citations.]" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287 (*Cummings*). "That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials [citation], let alone establish abuse of discretion in impaneling separate juries." (*Ibid*.)

        v.    *Standard of review*

"A court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling. [Citation.] Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial." (*Coffman*, *supra*, 34 Cal.4th at p. 41.)

"If the court's joinder ruling was proper when it was made . . . we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 452.)

14

The same standards apply to the review of a trial court's decision to deny complete severance and to impanel separate juries. (*Cummings*, *supra*, 4 Cal.4th at p. 1287 [applying "abuse of discretion" and "gross unfairness" standards].)

c. *Application*

Hayes contends that the trial court erred in denying his motions to sever because permitting a joint trial resulted in Hayes and Reed presenting antagonistic defenses.[9] Hayes argues that he defended the case on the theory that he had killed the victim in a drug-induced fit of rage, and that he lacked a preconceived plan to kill or steal, while Reed defended the case on the theory that he participated in the crimes under duress stemming from Hayes's implied threats to harm Reed. Hayes also contends that the trial court's failure to sever the trials resulted in gross unfairness. We are not persuaded that the trial court abused its discretion in denying the motions to sever, or that the joint trial resulted in gross unfairness.

To begin with, with respect to Hayes's contention that he and Reed presented antagonistic defenses, Hayes fails to point to *any* evidence presented to, or statements made in front of, *Hayes's* jury that Reed offered in support of his duress defense. Reed's out-of-court statements to law enforcement and Reed's counsel's closing argument contending that these statements demonstrated that Reed was not guilty of the charged offenses because he had acted under duress on the day in question, were *not* presented to Hayes's jury.

_____

[9] Hayes's briefing fails to adequately distinguish between his various pretrial and trial motions for severance and his due process claim. However, as distinct standards of review apply to the review of a denial of a motion to sever and a claim that a joint trial resulted in a due process violation, we attempt to parse his claim into distinct components.

15

Further, even assuming that Reed did present a defense that was antagonistic to Hayes's defense, before Hayes's jury, severance was not mandated because " 'there exist[e]d sufficient independent evidence' " on which the jury could find Hayes guilty of the charged offenses. (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 150.) Specifically, the jury was presented with ample independent evidence that Hayes committed the charged offenses, including evidence that Hayes had a motive to kill the victim, eyewitness testimony placing Hayes and Reed near the scene of the charged offenses on the day of the murder, DNA and other physical evidence linking Hayes and Reed to the charged offenses, and videotape evidence of Hayes and Reed together shortly after the crimes. (See pt. II.A., *ante*.) While the focus of Hayes's defense was that he lacked the intent required to be found guilty of the charged offenses because he did not have a preconceived plan to kill or to steal from the victim, the evidence cited above, including evidence that Hayes was recently estranged from his grandmother and needed money to purchase drugs, clearly constitutes sufficient independent evidence that he harbored the requisite intent to be convicted of the charged offenses. (See, e.g., *People v. Jaska* (2011) 194 Cal.App.4th 971, 984 [" 'intent . . . is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise' "].) Indeed, Hayes does not argue that there was a lack of sufficient independent evidence of his commission of the charged crimes. Accordingly, we conclude that the trial court did not abuse its discretion in denying Hayes's motions to sever. (See *Letner and Tobin*, *supra*, at p. 150 [the existence of antagonistic defenses does not compel severance where " 'there exists sufficient independent evidence against the moving defendant' "].)

16

Hayes has similarly failed to demonstrate that the joint trial resulted in gross unfairness. Hayes notes that the prosecutor stated during his opening statement that the police had learned the location of two kitchen knives taken from the victim's residence and a third knife tied to Hayes based on "information Mr. Reed provided." Even assuming that the prosecutor's comments were improper because the trial court had previously ruled that Reed's statements to law enforcement were not admissible as to Hayes, the prosecutor's reference was fleeting, and did not pertain to a central piece of evidence in the case.[10] Under these circumstances, any prejudice stemming from the prosecutor's statement was cured by the trial court's admonition to the jury, provided immediately after Hayes's counsel objected the prosecutor's statements, that the attorneys' statements did not constitute evidence.

Hayes also notes that during the trial, Reed's counsel cross-examined Hayes's father concerning Hayes's longstanding troubled relationships with various family members, and that this caused unfair prejudice to Hayes. However, the prosecutor covered that topic extensively during the direct examination of Hayes's father. Thus, Reed's counsel's cross-examination of Hayes's father did not involve the presentation of any new prejudicial information to Hayes's jury, and thus, did not result in gross unfairness to Hayes.

---

10     Hayes acknowledges that evidence that police discovered the knives was properly admitted in his case. He objects only to the prosecutor's reference that *Reed's statements* had led to the discovery of the knives.

17

2.   *The trial court did not err in failing to instruct the jury sua sponte concerning evidence of Hayes's commission of uncharged bad acts*

Hayes contends that the trial court erred in failing to instruct the jury sua sponte concerning evidence of Hayes's commission of various uncharged bad acts. Specifically, Hayes contends that the trial court was required to instruct the jury sua sponte that it could not consider this evidence for the purpose of determining that Hayes is a person of bad character who is predisposed to commit crimes.

a.   *Governing law*

Generally speaking, a trial court has no duty to instruct a jury sua sponte on the limited admissibility of other crimes and bad acts evidence. (*People v. Collie* (1981) 30 Cal.3d 43, 63-64 (*Collie*).) "*Collie*, *supra*, at page 64, recognizes a possible exception in 'an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052 (*Hernandez*).)

b.   *Application*

Although the People offered a considerable amount of evidence pertaining to Hayes's commission of uncharged bad acts, including his attempting to poison family members, stealing from family members and friends, and using drugs, this evidence was far from the " 'dominant part of the evidence against the accused.' " (*Hernandez*, *supra*, 33 Cal.4th at pp. 1051-1052.) Rather, the strong circumstantial evidence of Hayes's commission of the

18

charged offenses, discussed in part II.A.1 through 5, *ante*, constituted the bulk of the evidence against Hayes.

Further, while some of the evidence of the uncharged bad acts constituted evidence of serious criminal conduct, these acts cannot be considered " 'highly prejudicial' " in the sense of being "inflammatory" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1094 (*Mendoza*)), when compared to the circumstances of the charged murder and special circumstances allegations.

Finally, as Hayes acknowledges in his brief, Hayes's counsel did not object to the admission of the vast majority of the bad acts evidence, and this evidence was far from " 'minimally relevant to any legitimate purpose.' " (*Hernandez*, *supra*, 33 Cal.4th at p. 1052) Hayes concedes that both the prosecutor and his own counsel presented arguments in the trial court that "revealed the proper uses for the evidence of Hayes's uncharged acts." In particular, Hayes acknowledges that his counsel hoped that evidence of Hayes's troubled relationships with members of his family would "help the jury understand what Hayes thought when his grandmother rejected him shortly before the homicide occurred."

Accordingly, we conclude that "[t]his case does not present the type of 'extraordinary' situation contemplated in [*Collie*], *supra*, 30 Cal.3d 43, 177," for which the trial court was required to instruct the jury sua sponte on the limited admissibility of the uncharged bad acts evidence. (*Mendoza*, *supra*, 52 Cal.4th at p. 1094.)

3. *The trial court did not err in refusing to modify various jury instructions pertaining to consciousness of guilt*

Hayes contends that the trial court erred in refusing to modify several jury instructions on consciousness of guilt that are based on the defendant's making false or misleading statements, attempting to suppress evidence, and fleeing from the scene of the crime (CALCRIM Nos. 362, 371, and 372). Hayes notes that these instructions informed the jury that it could infer that Hayes was "aware of his guilt" if the jury found that he had engaged in the conduct mentioned in the instructions, and that the court should have modified the instructions to state that the jury could infer that Hayes "did something wrong or had feelings of guilt" from such conduct. Hayes contends that without such modifications, the instructions improperly permitted the jury to infer that he had "consciousness of guilt of the offenses charged against him."

Hayes concedes that the California Supreme Court has "rejected similar arguments in the past," but contends that those "cases are wrongly decided." Hayes further acknowledges that this court may consider itself bound by Supreme Court precedent, pursuant to *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, but presents this argument so that "he can ask the California Supreme Court to reconsider its prior rulings in this area."

We agree with Hayes that the California Supreme Court has rejected the argument that he raises on numerous occasions. (See, e.g., *People v. Page* (2008) 44 Cal.4th 1, 51-52 (*Page*).) For example, in *Page*, the Supreme Court considered a defendant's argument that it was improper for the trial court to have instructed the jury that it could infer that the defendant had "a consciousness of guilt" if the jury found that the defendant had willfully

20

made a false statement.  (*Page*, *supra*, at p. 49, fn. 23, quoting CALJIC No. 2.03.)  The

*Page* court rejected the defendant's argument that the instruction permitted the jury to

improperly infer that the defendant harbored the requisite mental states for various charged

crimes based on the conduct referred to in the instruction, reasoning:

> "[W]e disagree that the instruction informed the jury that it could infer
> from defendant's willfully false statements not only that he committed
> the crimes, but additionally that he harbored the mental states required
> for a finding of first degree murder, intent to commit a lewd act upon a
> child, and the related felony-murder special circumstance.  As
> defendant acknowledges, we rejected this contention in *People v.
> Crandell* (1988) 46 Cal.3d 833 (*Crandell*), in which we observed that
> '[a] reasonable juror would understand "consciousness of guilt" to
> mean "consciousness of some wrongdoing" rather than "consciousness
> of having committed the specific offense charged."  The instructions
> advise the jury to determine what significance, if any, should be given
> to evidence of consciousness of guilt, and caution that such evidence is
> not sufficient to establish guilt, thereby clearly implying that the
> evidence is not the equivalent of a confession and is to be evaluated
> with reason and common sense.  The instructions do not address the
> defendant's mental state at the time of the offense and do not direct or
> compel the drawing of impermissible inferences in regard thereto.'  (*Id.*
> at p. 871.)

> "Defendant disagrees with *Crandell's* view that a reasonable juror
> would understand the reference to 'consciousness of guilt' to mean
> 'consciousness of some wrongdoing,' and asserts that a reasonable juror
> would interpret 'guilt' to mean 'guilty of the crimes charged.' But only if
> the phrase 'consciousness of guilt' is considered without reference to
> the rest of the instructions can there be any confusion concerning the
> word 'guilt.'  A jury is instructed regarding the mental state that must be
> found to have existed *at the time* of the commission of the crimes in
> order to convict a defendant of each offense and special circumstance
> alleged.  No reasonable juror would conclude that CALJIC No. 2.03's
> guidance concerning an inference that may be drawn from a
> defendant's dishonest statements made *after* the commission of a crime
> establishes what the defendant was thinking at the time of the
> commission of the crime."  (*Page*, *supra*, 44 Cal.4th at pp. 51-52.)

21

As Hayes properly acknowledges, we are bound by the California Supreme Court's decisions on this point. (See *Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.) Accordingly, we conclude that the trial court did not err in refusing to modify CALCRIM Nos. 362, 371, and 372.

4.     *The trial court did not err in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter premised on voluntary intoxication*

Hayes claims that the trial court erred by failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter premised on unconsciousness due to voluntary intoxication.

    a.     *Standard of review*

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) In considering whether the trial court had a sua sponte duty to instruct the jury on lesser included offenses, we construe the evidence in the light most favorable to the appellant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368 (*Turk*).)

    b.     *Governing law*

        i.     *A trial court's duty to instruct on lesser included offenses*

"A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*.' [Citation.]" (*Cole*, *supra*, 33 Cal.4th at p. 1218.) In other words, "[s]uch instructions are required only where there is 'substantial

22

evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." (*People v. DePriest* (2007) 42 Cal.4th 1, 50.)

>             ii.      *Involuntary manslaughter premised on voluntary intoxication*

In *Turk,* this court explained that the Supreme Court has stated that, "A trial court must instruct the jury 'sua sponte on involuntary manslaughter based on unconsciousness' whenever 'there is evidence deserving of consideration[11] that the defendant was unconscious due to voluntary intoxication.' (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418 (*Halvorsen*); see also [*People v. Abilez* (2007) 41 Cal.4th 472, 515]; *People v. Ochoa* (1998) 19 Cal.4th 353 (*Ochoa*); CALCRIM No. 626.)" (*Turk*, *supra*, 164 Cal.App.4th at pp. 1371-1372, fn. omitted.)

CALCRIM No. 626 states in relevant part:

> "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] . . . . [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter."

---

11      In the footnote omitted from the text above, the *Turk* court stated:

> "In *People v. Breverman* (1998) 19 Cal.4th 142, 175, [footnote] 22 [(*Breverman*)], the court indicated that this standard is equivalent to the substantial evidence standard for instructing on lesser included offenses generally." (*Turk, supra*, 164 Cal.App.4th at p. 1372, fn. 6.)

23

c.     *Application*

We assume for purposes of this decision that Hayes is correct that "if a defendant kills while unconscious as a result of voluntary intoxication, the homicide is involuntary manslaughter," and that a trial court has a sua sponte duty to instruct on this theory where there is substantial evidence that a defendant was unconscious at the time of the killing due to voluntary intoxication. (See *Turk*, *supra*, 164 Cal.App.4th at pp. 1371-1372; but see also *id*., at p. 1376 [noting that in *People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. 40, the Supreme Court stated in dicta that, in light of certain statutory amendments, it " 'now appears that defendant's voluntary intoxication, even to the point of actual unconsciousness, would not prevent his conviction of second degree murder on an implied malice theory' "].)[12]

In making this claim in his opening brief, Hayes fails to identify *any* evidence of his intoxication, much less evidence of intoxication rising to the level of unconsciousness. In his reply brief, Hayes cites evidence that during an interview with law enforcement officers, he denied involvement in the murder and told the officers that he had been "getting high

---

[12]     To the extent that Hayes also contends that the trial court was required to instruct the jury that "a homicide committed without specific intent to kill as a result of voluntary intoxication is involuntary manslaughter," we reject any such claim. A homicide committed by a defendant lacking the specific intent to kill as a result of voluntary intoxication is not necessarily involuntary manslaughter, because such a defendant may still act with implied malice, which voluntary intoxication is not admissible to negate. (*Turk*, *supra*, 164 Cal.App.4th at pp. 1367-1378.) Accordingly, Hayes's proffered instruction is "an incorrect statement of California law." (*Id*. at p. 1367 [rejecting defendant's claim "that the trial court erred in failing to instruct the jury sua sponte that 'when a defendant, as a result of voluntary intoxication, kills another human being without premeditation and deliberation and/or without intent to kill (i.e., without express malice), the resultant crime is involuntary manslaughter' "].)

24

every day" around the time of the murder. Hayes contends that the jury could have inferred "from this evidence that [he] was so intoxicated when the homicide occurred that he was not aware what happened." We are not persuaded. This evidence is clearly not sufficient to warrant an involuntary manslaughter instruction premised on unconsciousness. (See, e.g., *Halvorsen*, *supra*, 42 Cal.4th 379 at pp. 418-419 [expert testimony that the defendant's blood-alcohol content might have approached .20 at the time of the shootings, and that the defendant "habitually drank to excess with resultant memory losses," did not constitute substantial evidence warranting an involuntary manslaughter instruction premised on unconsciousness].)

Accordingly, we conclude that the trial court did not err by failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter premised on voluntary intoxication.[13]

5. *There is no cumulative error*

Hayes claims that to the extent this court concludes that no individual error related to his claims merits reversal, the cumulative error doctrine requires reversal of the judgment.

---

[13] Hayes also joins in Reed's claims pertaining to the trial court's refusal to instruct the jury on the defense of claim of right and the trial court's failure to modify jury instructions related to inferences that the jury could draw pertaining to the defendants' possession of recently stolen property. We consider these claims in part III.B.2., *post* (claim of right) and part III.B.5, *post* (possession of recently stolen property).

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) We conclude in part III.B.5., *post*, that the trial court's failure to modify jury instructions pertaining to the defendants' possession of recently stolen property, was not prejudicial as to Reed, and Hayes fails to make any separate argument as to prejudice with respect to this claim. We have rejected the remainder of Hayes's claims. There is thus no cumulative error on which to base a reversal of the judgment.

B.      *Reed's Appeal*

1.      *The trial court did not err in failing to instruct the jury sua sponte on the defense of necessity*

Reed contends that the trial court erred in failing to instruct the jury sua sponte on the defense of necessity. Reed contends that there is substantial evidence "that he had no alternative to breaking the law and that his acts of assisting in searching for, and taking, Ms. Cothron's valuables would have prevented a greater evil than the one avoided." Specifially, Reed argues that this is so because he "believed it was a far less evil to rob than to be the victim of an armed assault and perhaps murder."

a.      *Governing law and standard of review*

i.      *A trial court's sua sponte duty to instruct on defenses*

It is well established that a trial court's "duty to instruct sua sponte arises when there is substantial evidence supportive of a defense that is not inconsistent with the defendant's theory of the case." (*People v. Barraza* (1979) 23 Cal.3d 675, 691, citing *People v. Sedeno* (1974) 10 Cal.3d 703, 715-716.) " 'Substantial evidence is "evidence sufficient 'to deserve

26

consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " '

[Citations.]"  (*People v. Wilson* (2005) 36 Cal.4th 309, 331-332.)  In determining whether

there is substantial evidence to support an instruction concerning a defense, an appellate

court views the evidence in the light "most favorable to [the] defendant."  (*People v.

Shelmire* (2005) 130 Cal.App.4th 1044, 1055.)

      As applied to the defense of necessity, "the standard for evaluating the sufficiency of

the evidentiary foundation is whether a reasonable jury, accepting all the [defendant's]

evidence as true, could find the defendant's actions justified by necessity.  [Citation.]"

(*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1538-1539.)  However, a trial court has no

sua sponte duty to instruct the jury on the defense of necessity if there is insufficient

evidence in the record that would support the defense.  (See, e.g., *People v. Miceli* (2002)

104 Cal.App.4th 256, 267 ["Defendant failed to show substantial evidence in support of the

second and fifth elements [of the defense]; thus, he was not entitled to instruction on

necessity"]; *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1165 (*Verlinde*) ["the trial

court did not err in refusing to give a necessity defense instruction because the evidence was

insufficient to permit a reasonable jury to find these elements were established"]; *People v.

Kearns* (1997) 55 Cal.App.4th 1128, 1135 (*Kearns*) ["Kearns's evidence was insufficient to

permit a reasonable jury to find that these elements were established and thus . . . the trial

court . . . [did not] err[]."].)[14]

---

[14]    Throughout his briefing, Reed suggests that the trial court had a sua sponte to instruct
on the defense of necessity, *irrespective of whether there was substantial evidence to
support such a defense*.  For example, in his reply brief, Reed argues, "To the degree
respondent bases [its] response on there being insubstantial evidence of necessity to have

On appeal, we determine de novo whether the trial court had a sua sponte duty to instruct on a defense. (See *People v. Russell* (2006) 144 Cal.App.4th 1415, 1424 (*Russell*).)

## ii. *The defense of necessity*

" 'The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile.' [Citation.] 'By definition, the necessity defense is founded upon public policy and provides a justification distinct from the elements required to prove the crime.' [Citation.] 'Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime.' [Citation.]" (*Verlinde*, *supra*, 100 Cal.App.4th at pp. 1164-1165.)

---

warranted the relevant instruction, respondent misses the critical point, supported by legal authorities, that the instruction was warranted because Reed was relying on that particular defense." However, it is not the respondent, but Reed, who misses the critical point. As noted in the text, a trial court has no sua sponte duty to instruct on a defense absent substantial evidence that would support the defense. (See, e.g., *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 ["The trial court is charged with instructing upon every theory of the case *supported by substantial evidence*, including defenses that are not inconsistent with the defendant's theory of the case," italics added].)

We reject Reed's suggestion that the trial court had a sua sponte duty to instruct on the defense of necessity merely because Reed purportedly relied on the defense in the trial court. We say purportedly, because as Reed acknowledges in his appellate brief, Reed's counsel did not request a necessity instruction or otherwise indicate that Reed was attempting to rely on a necessity defense in the trial court. In any event, even assuming that Reed's counsel had made such a request, " 'A trial court has no duty to instruct the jury on a defense—*even at the defendant's request*—unless the defense is supported by substantial evidence.' [Citation.]" (*People v. Hill* (2005) 131 Cal.App.4th 1089, 1101, italics added.)

28

In *People v. Buena Vista Mines, Inc.* (1998) 60 Cal.App.4th 1198, 1202 (*Buena Vista Mines, Inc.*), the court outlined the elements of the defense of necessity and the defendant's burden of proof in establishing that defense:

> "To assert a defense of necessity, the defendant must show, by a preponderance of the evidence, that he or she 'violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which [he or] she did not substantially contribute to the emergency.  [Citations.]' [Citations.]"[15]

---

[15]    CALCRIM No. 3403 is the standard jury instruction on the defense of necessity and provides:

> "The defendant is not guilty of _____ *<insert crime[s]>* if (he/she) acted because of legal necessity.
> "In order to establish this defense, the defendant must prove that:
> "1 (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/ [or] someone else);
> "2 (He/She) had no adequate legal alternative;
> "3 The defendant's acts did not create a greater danger than the one avoided;
> "4 When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil;
> "5 A reasonable person would also have believed that the act was necessary under the circumstances;
> AND
> "6 The defendant did not substantially contribute to the emergency.
> "The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

29

Reed did not testify at trial, nor did he present any evidence in his defense.  Reed contends, however, that statements that he made during his interview with law enforcement officers, which the People offered in evidence at trial, constitute substantial evidence to support a necessity defense.

Although Reed does not precisely identify in his brief which interview statements he contends support a necessity instruction, his argument appears to focus on statements pertaining to events that occurred immediately before he and Hayes entered the victim's residence.  Reed told officers that he knocked on the front door of Cothron's home, and that when the victim opened the door, he handed her a card.  Reed explained that he then "pulled some bullshit story outta [his] ass," telling the victim, "The sheriff wanted me to give this to you."  According to Reed, as the victim took the card, "[Hayes] was behind the door and . . . rushed her."  Reed said that "[Hayes] knocked her on the ground and I walked in behind him and shut the door."

After a detective asked Reed why he and Hayes had gone to the victim's residence, the following colloquy occurred:

> "[Reed]:  I didn't even know what the fuck we were doing.  All I know
> is that he just said that we were gonna go in there and he was gonna
> grab his birth certificate, he was gonna grab some of her jewelry and
> her money and we were gonna leave.  He didn't say anything about
> hurtin' her, killing her anything like that.
>
> "[Detective]:  So he's basically gonna steal those things and then leave?
>
> "[Reed]:  But he didn't . . .
>
> "[Detective]:  When did he tell [you he] was gonna do that?

30

"[Reed]: He told me right before we went up to the door.

"[Detective]: He said basically he was gonna go in and steal those things . . .

"[Reed]: He said and I . . .

"[Detective]: and then leave?

"[Reed]: told him 'I don't wanna [have] anything to do with this.' He was 'All you have to do is just fuckin' knock and get her to open the fuckin' door.' I said 'I don't wanna have anything else to do with this.' So I knocked on the door and that's what happened. And then I wasn't gonna go in and he said, 'Get the fuck in the house and shut the door' and he had his knife out already so I, I just went in. I went inside.

"[Detective]: He had; okay let's go back. So you guys are talking outside. And he says he's just gonna go in and steal some money and the jewelry and stuff, right?

"[Reed]: No verbal response.

"[Detective]: And he just wants you to knock on the door?

"[Reed]: (nods head)

"[Detective]: Am I? Do I have this right?

"[Reed]: Yes.

"[Detective]: At what point is his knife in his hand?

"[Reed]: It's already in his hand.

"[Detective]: He's already got it in his hand?

"[Reed]: (nods head).

"[Detective]: As you're going up to the front door?

"[Reed]: (nods head)."

31

Later during the interview, when the officers returned to the issue of the manner by which Reed entered the residence, the following colloquy occurred:

"[Detective]:  [Hayes] was the first through the door and you went in after him?

"[Reed]:  I shut the door.

"[Detective]:  And you shut the door?

"[Reed]:  'Cause he told me to.

"[Detective]:  Well, why did you think you shut the door?  Why do you think he wanted the door shut?

"[Reed]:  I don't know.

"[Detective]:  Maybe so . . . nobody would see?

"[Reed]:  Probably.  I don't know (unin.) . . .

"[Detective]:  Oh yeah.

"[Reed]:  All I know is I know (unin.) when someone's got a knife in their hand.

"[Detective]:  Did he threaten you with the knife?

"[Reed]:  No, not that I heard but he was starting to get a little loud.

"[Detective]:  Why didn't you just run?

"[Reed]:  No verbal response.

"[Detective]:  You're behind him. Why not open the door and run?

"[Reed]:  No verbal response.

"[Detective]:  Could you have done that?

"[Reed]:  No, I've got bad knees.

32

"[Detective]: Why not run out in the middle of the street and scream and yell, 'Help, help, help, help, help?'

"[Reed]: To be honest with you, I don't know. My head. I don't know what the hell . . . ."

      c.    *Application*

Even viewed in the light most favorable to Reed, Reed's interview statements do not constitute a sufficient basis for the trial court to instruct the jury on the defense of necessity. To begin with, Reed's own statements demonstrate that he did not act "to prevent a significant and imminent evil." (*Buena Vista Mines, Inc*., *supra*, 60 Cal.App.4th at p. 1202.) Rather, Reed's statements indicate that he willingly and freely agreed to participate in a ruse to gain entry to the victim's residence merely upon Hayes's request that he do so, and that any concern that Reed may have had about Hayes's possession of a knife surfaced only after Reed had " 'substantially contribute[d] to the emergency' " (*ibid*.) by knocking on the victim's door:

> "[I] told him 'I don't wanna [have] anything to do with this.' He was 'All you have to do is just fuckin' knock and get her to open the fuckin' door.' I said 'I don't wanna have anything *else* to do with this.' So I knocked on the door and that's what happened. And then I wasn't gonna go in and he said, 'Get the fuck in the house and shut the door' and he had his knife out already so I, I just went in. I went inside." (Italics added.)

Reed also failed to demonstrate that he had no "reasonable legal alternative" but to participate in the robbery. (*Buena Vista Mines, Inc*., *supra*, 60 Cal.App.4th at p. 1202.) When asked whether Hayes had threatened him with the knife, Reed responded, "No not that I heard . . . ." Reed also acknowledged that he could not explain why he had failed to summon assistance after he realized that Hayes had attacked the victim:

33

> "[Detective]: Why not run out in the middle of the street and scream and yell, 'Help, help, help, help, help?'
>
> "[Reed]: To be honest with you, I don't know. My head. I don't know what the hell . . . ."

(See *Kearns*, *supra*, 55 Cal.App.4th at p. 1135 ["Most notably, Kearns did not establish the absence of a reasonable legal alternative to committing the crimes and clearly at least one such alternative existed, to wit, asking the victim to call police rather than carrying out the robbery."].)

In addition, Reed failed to present any evidence that his actions did not "creat[e] a greater danger than the one avoided." (*Buena Vista Mines, Inc.*, *supra*, 60 Cal.App.4th at p. 1202.) Reed used a ruse to get the elderly victim to open the front door to the residence, while knowing that Hayes was hiding behind the front door with a knife in his hands, waiting to attack and rob the victim. Any danger to himself that Reed may have avoided was no greater than the danger that he created for the victim by participating in the scheme to gain entry to the victim's residence. (Cf. *Kearns*, *supra*, 55 Cal.App.4th at p. 1135 ["the necessity defense is inappropriate in this case because its recognition would encourage rather than deter violence"].)

34

In sum, because there is not substantial evidence in the record with respect to several of the required elements of the defense of necessity, the trial court did not err in failing to instruct on the defense.[16]

2. *The trial court did not err in failing to instruct the jury sua sponte on the affirmative defense of claim-of-right*

Reed contends that the trial court erred in failing to instruct the jury sua sponte on the affirmative defense of claim-of-right.

a. *Governing law and standard of review*

A claim-of-right defense "negates the felonious intent necessary for conviction of theft or robbery," and applies where a defendant holds a good faith belief that he has a right or claim to property that he takes from another. (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 (*Tufunga*).) The *Tufunga* court explained the rationale for the defense:

> " ' "Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he [or she] takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule . . . that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations], or that he [or she] had a right to retake goods sold [citation]

---

[16] Reed also claims that his trial counsel provided ineffective assistance by failing to request an instruction on necessity. Our conclusion that the record lacks substantial evidence to support the giving of such an instruction defeats that argument. (*Kearns, supra*, 55 Cal.App.4th at p. 1135 [rejecting claim that trial counsel provided ineffective assistance by failing to request necessity instruction because "Kearns's evidence was insufficient to permit a reasonable jury to find that the[] elements [of the necessity defense] were established and thus neither the trial court nor defense counsel committed error"]; *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1038 ["Since [the] defense[] of necessity . . . w[as] not available to defendant as a matter of law, we reject his related claim[] that . . . he received ineffective assistance of counsel when his trial attorney did not request instructions on the defense[], to which we have concluded he was not entitled"].)

35

is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he [or she] has a right or claim to it." ' " (*Id.* at p. 943.)

"[A] good faith belief by a defendant, tried as an accomplice, that he was assisting his coprincipal retake the principal's property negates the 'felonious intent' element of both larceny and robbery, and that an instruction on the claim-of-right defense must be given where substantial evidence supports such a belief." (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1528-1529 (*Williams*).)

CALCRIM No. 1863 is a standard jury instruction that delineates the claim-of-right defense. That instruction provides in relevant part:

> "If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery).
>
> "The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) openly took it."

A trial court must instruct the jury sua sponte on a claim-of-right defense "if there is substantial evidence that supports the defense and the defense is not inconsistent with the defendant's theory of the case." (*Russell*, *supra*, 144 Cal.App.4th at p. 1429.)[17] On appeal, we apply the de novo standard of review to a defendant's claim that the trial court erred in

---

[17]  We assume for purposes of this decision that a trial court has a sua sponte duty to instruct on a claim-of-right defense, notwithstanding the Supreme Court's decision in *People v. Anderson* (2010) 51 Cal.4th 989 (*Anderson*).  (But cf. *People v. Lawson* (2013) 215 Cal.App.4th 108, 119 ["as explained in *Anderson,* the trial court's sua sponte instructional duties do not apply to defenses that serve only to negate the mental state element of the charged offense when the jury is properly instructed on the mental state element, even when substantial evidence supports the defense and it is consistent with the defendant's theory of the case"].)

failing to instruct the jury sua sponte on the affirmative defense of claim-of-right. (See *id.* at p. 1424.)

        b.    *Application*

Reed contends that the trial court was required to instruct the jury on the defense of claim-of-right because the record contains substantial evidence that Hayes's and Reed's intent in entering the victim's residence was to retrieve Hayes's birth certificate from the victim. Even assuming that there was substantial evidence to this effect, a claim-of-right defense has no application in this case because none of the charged offenses were premised on appellants' acts in taking or attempting to take Hayes's birth certificate, or entering the victim's residence with the intention of taking Hayes's birth certificate. During closing argument, the prosecutor made clear that the burglary and robbery charges were premised on appellants' acts in entering the victim's residence for the purpose of taking her money and jewelry.[18] Reed points to no evidence in the record that either he or Hayes had any claim of right to the victim's money or jewelry.

Further, we reject Reed's contention that "the claim of right defense was . . . relevant to the question of whether Reed went to Ms. Cothron's house with the intent to steal property belonging to Ms. Cothron or rather, as [Reed] claimed, to procure the birth certificate." In making this argument, Reed confuses a purported lack of the requisite intent to commit a burglary because Reed and Hayes entered the residence to retrieve the birth certificate, with a claim-of-right defense. A claim-of-right defense would apply only if

---

18    The burglary and robbery also served as the predicate felonies for the People's prosecution of both Reed and Hayes under a felony murder theory of liability.

Reed were charged with committing a burglary premised on his intent to assist in the *taking of the birth certificate* and there was substantial evidence that Reed lacked such intent because Reed believed that "he was assisting his coprincipal retake the principal's property." (*Williams*, *supra*, 176 Cal.App.4th at pp. 1528-1529.) However, because Reed was prosecuted on a theory that he entered the residence with the intent to steal Cothran's property, *not* on the theory that he committed a burglary premised on his intent to assist in the taking of the birth certificate, no claim-of-right defense was available to Reed in this case.

While Reed is correct that the prosecutor "took special care to rebut the claim by Reed that he had accompanied Hayes to retrieve the certificate," at no time did the prosecutor suggest that Hayes and Reed could be found guilty of burglary *even if* they entered the residence with the sole intent to retrieve the birth certificate. If the prosecutor had made this argument, then a claim-of-right defense would theoretically be available to negate the possibility that Reed could suffer a conviction premised on the appellants' entry into the residence with the intent solely to feloniously take the birth certificate. We say theoretically, because even assuming that the prosecutor had made this argument, we strongly question whether there is any evidence in the record that would support the conclusion that, at the moment Reed and Hayes entered the victim's residence, their sole intent was to retrieve Hayes's birth certificate. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 622 [concluding no claim-of-right defense was available based on accomplice's good faith claim of right to sports car where "[t]he record discloses no substantial evidence that defendant's intent, on entering the house or attacking the victim, was limited to taking the

38

sports car, its title slip, or even property of equivalent value"].) However, we need not determine this issue, because even assuming that there was such evidence, as we concluded above, a claim-of-right instruction was not warranted in this case because Reed's burglary, robbery, and murder convictions were *not* premised on Reed's attempt to assist Hayes in retrieving his birth certificate.

Accordingly, we conclude that the trial court did not err in failing to instruct the jury sua sponte on the affirmative defense of claim of right.[19]

3.    *The trial court did not commit reversible error in instructing the jury concerning Reed's possession of recently stolen property*

Reed claims that the trial court erred in failing to modify a standard jury instruction (CALCRIM No. 376) pertaining to a defendant's possession of recently stolen property. Reed maintains that the trial court was required to modify the instruction to make clear that the instruction applied only to theft-related offenses, and that the instruction that the court provided permitted the jury to infer from Reed's possession of the victim's property that he committed the murder. We conclude that the trial court committed harmless error in failing to modify the instruction to make clear that a portion of the instruction applied only to the theft-related offenses and special circumstances allegations.

---

[19]    In light of our conclusion that the record lacks substantial evidence to support a claim-of-right defense, we need not consider whether that defense is inconsistent with Reed's duress defense. (See *Russell*, *supra*, 144 Cal.App.4th at p. 1429 [trial court must instruct sua sponte on defense of claim of right "if there is substantial evidence that supports the defense *and* the defense is not inconsistent with the defendant's theory of the case" (italics added)].)

39

a.    *Factual and procedural background*

The trial court instructed Reed's jury pursuant to a modified version of CALCRIM

No. 376 as follows:

> "If you conclude that the defendant knew [he] possessed property and
> you conclude that the property had in fact been recently stolen, you
> may not convict the defendant based on those facts alone.  However, if
> you also find that supporting evidence tends to prove guilt, then you
> may conclude that the evidence is sufficient to prove [he] committed
> *the crime*.
>
> "The supporting evidence need only be slight and need only [*sic*] be
> enough itself [*sic*] to prove guilt.[20]  You may consider how, where,
> and when the defendant possessed the property, along with any other
> relevant circumstances tending to prove his guilt.  Remember that you
> may not convict the defendant of any crime unless you are convinced
> that each fact essential to the conclusion that the defendant is guilty of
> that crime has been proved beyond a reasonable doubt."[21]  (Italics
> added.)

b.    *Standard of review and governing law*

We review de novo a defendant's claim that the trial court's jury instructions did not

correctly state the law.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  "Review of the

adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the

applicable law.'  [Citation.]"  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  In

determining whether error has been committed in giving jury instructions, we consider the

---

[20]    The clerk's transcript, which contains the modified version of CALCRIM No. 376 at
issue, indicates that the jury instruction should have read, "The supporting evidence need
only be slight and need *not* be enough *by* itself to prove guilt."  (Italics added.)

[21]    The trial court provided a nearly identical instruction to Hayes's jury.

40

instructions as a whole and assume that jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*)

In *People v. Prieto* (2003) 30 Cal.4th 226, 248 (*Prieto*), the Supreme Court considered a defendant's claim that the trial court had erred in failing to limit a similar instruction (CALJIC No. 2.15) to theft-related charged offenses, in a case in which the defendant was also charged with rape and murder.[22] The *Prieto* court concluded that the trial court had erred in failing to limit the instruction to theft-related offenses:

> "Although the trial court gave the jury the standard version of CALJIC No. 2.15, the court did not limit the instruction to theft-related offenses as suggested by the use note. (See Use Note to CALJIC No. 2.15 (5th ed. 1988) p. 40 ['This instruction will serve to cover the effect of possession of recently stolen property in robbery, burglary, theft and receiving stolen property'].)[23] Instead, the court instructed the jury that: 'If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant ALFREDO PRIETO is guilty of the *crimes charged.*' (Italics added.) Defendant contends the application of CALJIC No. 2.15 to defendant's nontheft offenses—i.e., rape and murder—was improper because it encouraged jurors to draw impermissible inferences favorable to the prosecution and lowered the prosecution's burden of proof. (See *People v. Barker*

---

22    The full instruction at issue in *Prieto* stated: " 'If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant ALFREDO PRIETO is guilty of the crimes charged. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession—time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, any other evidence which tends to connect the defendant with the crime charged." (*Prieto*, *supra*, 30 Cal.4th 226 at p. 248, fn. 5.)

23    CALCRIM No. 376 contains a similar use note, which states in relevant part, "Use of this instruction should be limited to theft and theft-related crimes."

41

(2001) 91 Cal.App.4th 1166, 1176 (*Barker*).)  The People counter that *Barker* was wrongly decided and that the permissive inference described in CALJIC No. 2.15 may be applied to nontheft offenses. We find *Barker* persuasive and hold that the trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder was improper."  (*Prieto*, *supra*, at p. 248, fn. omitted.)

Although the *Prieto* court concluded that the trial court had erred in failing to limit the instruction to theft-related offenses, the court rejected the "defendant's contention that the trial court's instruction mandates reversal because it lowered the prosecution's burden of proof."  (*Prieto*, *supra*, 30 Cal.4th at p. 248.)  The *Prieto* court reasoned:

"CALJIC No. 2.15 did not directly or indirectly address the burden of proof, and nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt.  Moreover, other instructions properly instructed the jury on its duty to weigh the evidence, what evidence it may consider, how to weigh that evidence, and the burden of proof.  In light of these instructions, there is 'no possibility' CALJIC No. 2.15 reduced the prosecution's burden of proof in this case.  (*Barker*, *supra*, 91 Cal.App.4th at p. 1177.)"  (*Prieto*, *supra*, at p. 248.)

Applying the *Watson*[24] standard of prejudice applicable to errors of state law, the *Prieto* court concluded that the trial court's instructional error "was not prejudicial because there was no reasonable likelihood the jury would have reached a different result if the court had limited the permissive inference described in CALJIC No. 2.15 to theft offenses." (*Prieto*, *supra*, 30 Cal.4th at p. 249.)

In the wake of *Prieto*, the California Supreme Court has repeatedly held that "instructing that possession of stolen property may create an inference that a defendant is guilty of murder, as was done here, is error." (*People v. Gamache* (2010) 48 Cal.4th 347,

---

24      *People v. Watson* (1956) 46 Cal.2d 818.

375 (*Gamache*); see also e.g., *Coffman*, *supra*, 34 Cal.4th at p. 101.) The Supreme Court has also repeatedly applied the *Watson* standard of prejudice to this instructional error. (*Gamache*, *supra*, at p. 376 ["Though Gamache argues that error in giving CALJIC No. 2.15 is either structural or subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)], it is well established the [*Watson*] test applies"]; *Coffman*, *supra*, 34 Cal.4th at p. 101 [applying *Watson*].)

In *People v. Moore* (2011) 51 Cal.4th 1104, 1130 (*Moore*), the California Supreme Court concluded that a trial court had erred in giving an instruction "nearly identical" to the instruction at issue in *Prieto*. The *Moore* court revisited the proper standard of prejudice to apply in determining whether this error required reversal, and concluded that "contrary to defendant's arguments that the error is one of federal constitutional magnitude, . . . the error is one of state law only." (*Moore*, *supra*, at p. 1130.) In reaching this conclusion, the *Moore* court reasoned in part:

> "First, informing the jury that it may infer defendant's guilt of murder in these circumstances did not allow it to convict defendant based on a 'fundamentally incorrect theory of culpability.' The instruction in no way altered the trial court's proper instructions concerning the elements of murder that the prosecution was required to prove beyond a reasonable doubt. The jury was instructed it could draw merely 'an inference of guilt' from the fact of possession with slight corroboration, which any rational juror would understand meant he or she could consider this inference in deciding whether the prosecution has established the elements of murder (and the other offenses) elsewhere defined in the trial court's instructions. "The instruction purported to explain to the jury its proper consideration of a particular item of circumstantial evidence in reaching a verdict on the charges; it did not alter the defining elements of those charges.

"In addition, the instruction, although erroneous in applying the slight corroboration rule to the murder charge, did not create an improper permissive inference under the federal Constitution. The federal due process clause 'prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.' [Citation.] Because permissive inferences, as opposed to mandatory inferences, do not *require* that the jury reach a certain finding based on a predicate fact, the prosecution's burden of persuasion is improperly diminished only if the permissive inference is irrational. [Citation].

"Although we concluded in *Prieto* that the connection between a defendant's guilt of nontheft offenses and his or her possession of property stolen in the crime is not sufficiently strong to warrant application of the slight corroboration rule, this does not mean that drawing a connection between possession and guilt is irrational. Indeed, the United States Supreme Court has acknowledged explicitly the logical connection between possession of the fruits of a crime and the possessor's guilt of that crime, even when the crime at issue is a nontheft offense." (*Moore*, *supra*, at pp. 1131-1132.)

c.    *The trial court committed harmless error in instructing the jury concerning Reed's possession of recently stolen property*

At the outset, we reject the People's contention that Reed's failure to object in the trial court forfeited his appellate claim. (See *Moore*, *supra*, 51 Cal.4th at p. 1130 [permitting defendant to raise appellate contention that trial court erred in failing to limit jury instruction pertaining to defendant's possession of stolen property to theft-related charges notwithstanding lack of objection in trial court]; see also *People v. Kelly* (2007) 42 Cal.4th 763, 791 [a claim that an instruction is not "correct in law" may be raised on appeal despite the failure to object below].) We also reject the People's contention that the "instruction itself was proper," because it did not specifically refer to "the charged crimes," or "murder." By referring to "the crime" in the modified jury instruction, the trial court

44

failed to limit the applicability of this portion of the instruction to theft-related crimes, as is required. (See, e.g., *Moore*, *supra*, 51 Cal.4th at p. 1130; *Prieto*, *supra*, 30 Cal.4th at pp. 248-249; *Barker, supra,* 91 Cal.App.4th at p. 1177.)

With respect to the appropriate standard of prejudice to be applied in determining whether the error requires reversal, Reed cites an unpublished decision (*Sherrors v. Woodford* (9th Cir. 2011) 425 Fed.Appx. 617, 618-620 (*Sherrors*)) in which the United States Court of Appeals for the Ninth Circuit concluded that a nearly identical instructional error was "of constitutional magnitude," subject to the *Chapman* harmless beyond a reasonable doubt standard. (*Sherrors*, *supra*, at p. 619.) We decline to apply *Sherrors.* Our Supreme Court has repeatedly held that the *Watson* standard applies in this context (see *Moore*, *supra*, 51 Cal.4th at p. 1133 ["We apply the *Watson* standard in assessing the harmfulness of the instructional error, as we have done in *Prieto, Coffman* and *Gamache*"]), and has expressly rejected the contention that the error in question is one of constitutional magnitude. (See *Moore*, *supra*, at p. 1130.) We are bound by our high court's decision that such error does not implicate the federal constitution. (See, e.g., *People v. Landry* (1996) 49 Cal.App.4th 785, 791 ["No contrary United States Supreme Court decision exists on this issue, and we are bound by our high court's interpretation of federal law"].)

Applying *Watson*, it is clear that the trial court's error in failing to modify the instruction was harmless. To begin with, as Reed acknowledges, "Given that Reed was convicted of murder on a felony-murder basis, the issue would appear on its face likewise to be harmless inasmuch as the jury found him guilty of robbery and burglary, the predicate offenses of felony murder and thus a conviction of murder would have resulted in any

45

event, i.e. with or without the erroneous instruction."[25] We agree that given that the instruction was entirely proper with respect to the offenses of burglary and robbery (see *People v. Smithey* (1999) 20 Cal.4th 936, 975-978 [concluding trial court did not err in instructing the jury pursuant to CALJIC No. 2.15 with respect to underlying crimes of robbery and burglary in felony-murder prosecution]), Reed's convictions on the predicate offenses on which Reed's felony-murder conviction is based are not infected with instructional error. Further, the People presented compelling evidence that Reed participated in a burglary and a robbery during which a murder occurred, including Reed's own statements to law enforcement officers in which Reed admitted both that he facilitated Hayes's entry into the victim's residence and that he stole items from the victim while Hayes was killing her.

We also reject Reed's contention in his brief that it is "reasonably probable the jury discounted Reed's defense of duress as being superseded by CALCRIM 376." With respect to Reed's contention that the jury "may well have found Reed acted under duress, but nevertheless convicted Reed of murder based on a reading of the instructions as calling for a conviction of murder even if Reed had been under duress, merely on the basis of he, after-the-fact, having been in the possession of the stolen property," we conclude that no reasonable jury could have interpreted the instructions in such a manner. The trial court's modified version of CALCRIM No. 376 informed the jury that it could *not* convict Reed based solely on his knowing possession of stolen property, and reminded the jury it could

---

25      Although Hayes joins in Reed's claim, he makes no independent argument as to prejudice. Accordingly, we restrict our analysis to the argument that Reed advances in his brief.

46

not find Reed guilty of *any* crime "unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Finally, Reed does not dispute that the jury was properly instructed on the elements of felony murder, the manner by which the jury was to consider evidence pertaining to that offense, and the burden of proof. The Supreme Court has repeatedly concluded that instructional error of the type at issue in this case was harmless in light of the " 'panoply of other instructions that guided the jury's consideration of the evidence.' [Citation]." (*Moore*, *supra*, 51 Cal.4th at p. 1133.) The same is true in this case.

Accordingly, we conclude that the trial court did not commit reversible error in instructing the jury pursuant to CALCRIM No. 376.[26]

4.      *There is substantial evidence to support the jury's robbery-murder special circumstance finding*

Reed contends that there is insufficient evidence in the record to support the jury's robbery-murder special circumstance finding (§ 190.2, subd. (a)(17)). Specifically, Reed contends that no rational juror could have found that he was a "major participant" (§ 190.2, subd. (d)) in the robbery or that he acted with "reckless indifference to human life" (*ibid*.), both of which are required to support a robbery-murder special circumstance finding premised on aiding and abetting liability.

---

26      Reed also joins in all of the claims that Hayes raises in his opening brief. In light of our rejection of all of Hayes's claims, Reed is not entitled to any relief premised on such joinder.

a.      *Governing law*

In *People v. Proby* (1998) 60 Cal.App.4th 922 at pages 927-928 (*Proby*), the court outlined the law governing a robbery-murder special circumstances allegation premised on aiding and abetting liability:

> "In order to support a finding of special circumstances murder, based on murder committed in the course of robbery, against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds. (c), (d).)
>
> "Subdivision (d) of section 190.2, concerning reckless indifference, 'was added by Proposition 115 in order to bring the death penalty into conformity with *Tison v. Arizona* (1987) 481 U.S. 137, 158 [(*Tison*)]. [Citation.]  *Tison* held that the death penalty may be imposed in a case of "major participation in the felony committed, combined with reckless indifference to human life."  Put another way, *Tison* held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."  [Citation.]' (*People v. Bustos* (1994) 23 Cal.App.4th 1747, 1753, fn. omitted. [(*Bustos*)])  The term 'reckless indifference to human life' means 'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.' (*People v. Estrada* (1995) 11 Cal.4th 568, 578 [(*Estrada*)].)"  (*Proby*, *supra*, at pp. 927-928, fn. omitted.)

Section 190.2 provides in relevant part:

> "(c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances

48

enumerated in subdivision (a) has been found to be true under Section 190.4.[27]

"(d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) [including robbery in violation of section 211] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

b.      *Standard of review*

"To determine the sufficiency of the evidence to support a special circumstance finding, we apply the same test used to determine the sufficiency of the evidence to support a conviction of a criminal offense. We 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 790-791.)

c.      *There is substantial evidence that Reed was a major participant in the robbery, and that he acted with reckless indifference to human life*

Reed contends that there is insufficient evidence that he was a "major participant" (§ 190.2, subd. (d)) in the robbery. We disagree.

---

27    Section 190.4 prescribes the manner by which special circumstances allegations are to be tried.

49

"In this context, a 'major participant' in the underlying crime includes persons ' "notable or conspicuous in effect or scope" and "one of the larger or more important members or units of a kind or group." ' [Citation.]" (*People v. Hodgson* (2003) 111 Cal.App.4th 566, 578.) In *Hodgson*, the defendant held open a garage door, which facilitated his accomplice's (Salazar) escape after Salazar robbed and shot and killed a woman in a parking garage. The *Hogdson* court concluded that the defendant's acts constituted sufficient evidence that the defendant had been a major participant in the robbery:

> "The present case does not present evidence appellant supplied the gun, or was armed, or personally took the loot, or the like. Nevertheless, his role in the robbery murder satisfies the requirement his assistance be 'notable or conspicuous in effect or scope.' [Citation.]
>
> "To begin with, this is not a crime committed by a large gang or a group of several accomplices. Instead only two individuals were involved. Thus, appellant's role was more 'notable and conspicuous'— and also more essential—than if the shooter had been assisted by a coterie of confederates. By slowing down the closing automatic electric garage gate appellant was instrumental in assisting Salazar effect his escape with the loot. From their actions it appears appellant and Salazar believed the garage gate was the only access route for their escape. The evidence showed appellant used the full force of his body to try to keep the gate from closing until Salazar had accomplished the robbery and secured the loot. When the gate became dangerously close to closing appellant yelled a warning to Salazar and got out of his way to permit Salazar to exit. . . . Because appellant was the only person assisting Salazar in the robbery murder his actions were both important as well as conspicuous in scope and effect." (*Hodgson*, *supra*, at pp. 579-580.)

Reed's participation in the robbery in this case far exceeds that of the defendant in *Hodgson*. As Reed acknowledges in his reply brief, there is evidence in the record "that he helped Hayes . . . gain entrance into Ms. Cothron's home and then took property from her

50

home; that he helped ditch . . . knives [taken from the victim's home and brought to the robbery] . . . ; [and] that he went to Tijuana with Hayes and partied after the killing." Thus, Reed, acting with a single accomplice, facilitated the commission of the robbery, took property from the victim, assisted in his accomplice's escape, and enjoyed the fruits of the robbery. This constitutes ample substantial evidence that Reed was a major participant in the robbery. (See *Hodgson*, *supra*, 111 Cal.App.4th at pp. 579-580; *People v. Smith* (2005) 135 Cal.App.4th 914, 928 [jury could reasonably find that defendant was major participant of armed robbery were he "served as the only lookout to an attempted robbery occurring in an occupied motel complex"]; *Proby*, *supra*, 60 Cal.App.4th at p. 929 [noting that defendant took money from safe during robbery-murder in affirming robbery-murder special circumstance finding]; accord *Tison*, *supra*, 481 U.S. at p. 158 ["Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight."].)

We reject Reed's assertion that evidence that he was "pliable" and a "follower" demonstrates that there is no substantial evidence that he was a major participant in the robbery. We also reject Reed's contention that the lack of evidence that he had previously committed crimes with Hayes or that he went to Alpine for the specific purpose of committing the robbery demonstrates that he was not a major participant in the robbery. Finally, although Reed contends that "the evidence is considerable that he wanted nothing to do with the killing *or* the robbery" (italics added), the jury could infer from the evidence

51

discussed above that he was a major participant in the robbery that led to the killing. In that regard, we note that the jury heard Reed's admission to detectives that he looked for things to steal from the victim's residence *while Hayes was killing her.*

Reed also contends that there is insufficient evidence that he acted with "reckless indifference to human life." Again, we disagree.

Evidence that a defendant knew that his accomplice was armed during the commission of a robbery supports a finding of "reckless indifference to human life." (See, e.g., *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1116 (*Lopez*) ["The fact Brousseau knew Lopez had a gun shows that she acted with reckless indifference to the life of [robbery victim]"]; *Bustos*, *supra*, 23 Cal.App.4th at p. 1754 ["Loretto admitted knowing about and having seen the knife, saying 'we were using it for protection.' "].) In addition, courts have noted that a defendant's act in assisting an accomplice in the commission of a dangerous robbery may support a finding of reckless indifference. (See, e.g., *Lopez*, *supra*, at p. 1117 [concluding that defendant's act in luring victim into secluded area to facilitate robbery supported finding of reckless indifference]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 ["Defendant had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result."].) Courts have also repeatedly held that a defendant's act in fleeing the scene of a robbery-murder rather than summoning aid for an injured victim manifests a reckless indifference to human life. (See, e.g., *Smith*, *supra*, 135 Cal.App.4th at p. 928 [defendant acted with reckless indifference by continuing to assist with robbery instead of coming to injured victim's aid]; *Hodgson*, *supra*, 111 Cal.App.4th at

52

p. 580; *Proby*, *supra*, 60 Cal.App.4th at p. 929 [same]; *Bustos*, *supra*, 23 Cal.App.4th at pp. 1754-1755 [same].)

The record contains evidence that prior to approaching the victim's residence, Reed knew that Hayes had recently been informed that the victim had obtained a restraining order against Hayes, and that Hayes was holding a knife. In addition, the record contains evidence that Reed used a ruse to get the victim to open the front door to the residence, knowing that Hayes was hiding behind the front door with a knife in his hand. Reed also admitted to law enforcement officers that he knew prior to entering the victim's house that Hayes intended to steal the victim's belongings. In addition, after Reed saw Hayes strangling the victim and holding a knife to her neck, Reed began to search the house for valuables to steal. After the incident, Reed fled the scene without summoning assistance, notwithstanding that he was aware that the victim had, at a minimum, been seriously injured. Reed and Hayes subsequently used the proceeds of the robbery and burglary to purchase various items, including clothing and drugs. In sum, the record contains evidence that Reed facilitated a home invasion robbery of an elderly woman whom Reed could have reasonably anticipated would be physically harmed during the robbery; participated in the theft of the woman's belongings while she was being strangled to death; left the victim to die; and thereafter enjoyed the fruits of the robbery. Evidence of Reed's commission of these acts constitutes substantial evidence from which a reasonable jury could find that Reed acted with "reckless indifference to human life." (§ 190.2, subd. (d).)

Accordingly, we conclude that there is sufficient evidence in the record to support the jury's true finding on the robbery-murder special circumstance (§ 190.2, subd. (a)(17)).[28]

> 5.   *Reed forfeited his claim that the trial court's imposition of a sentence of life without the possibility of parole constituted cruel and unusual punishment under the federal and state constitutions*

Reed claims that the trial court's imposition of a sentence of life without the possibility of parole constitutes cruel and unusual punishment under the federal and state Constitutions.   Specifically, Reed claims that the imposition of a sentence of life without the possibility of parole is unconstitutional given the "unique circumstances of his particular case and his challenging developmental limitations."

In *People v. Norman* (2003) 109 Cal.App.4th 221, 229-230, the Court of Appeal concluded that a defendant had forfeited his claim that his sentence constituted cruel or unusual punishment within the meaning of the state and federal constitutions.  The *Norman* court reasoned:

> "Defendant waived this contention by not raising it in the trial court. Cruel and unusual punishment arguments, under the federal or California tests, require examination of the offense and the offender. '*Dillon* [*People v. Dillon* (1983) 34 Cal.3d 441] makes clear that its holding was premised on the unique facts of that case. [Citation.] Since the determination of the applicability of *Dillon* in a particular case is fact specific, the issue must be raised in the trial court.  Here, the matter was not raised below, and is therefore waived on appeal.' [Citation.]"  (*Norman*, *supra*, at pp. 229-230.)

---

28     We do not read Reed's brief as contending that there is no substantial evidence to support the *burglary*-murder special circumstance finding.  To the extent that Reed intends to raise such a challenge, he has failed to make any cognizable argument as to the burglary-murder special circumstance finding apart from that rejected in the text with respect to the robbery-murder special circumstance finding.

Reed failed to raise any claim of cruel and unusual punishment in the trial court.[29]

Further, Reed's claim of cruel and unusual punishment on appeal is based, in part, on various factual allegations concerning the circumstances of the offenses and his cognitive and emotional disabilities that were never presented in the trial court. His claim is thus forfeited on appeal. (See, e.g., *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045 [concluding defendant "forfeited the cruel and unusual punishment issue by failing to raise it in the trial court"]; *People v. Russell* (2010) 187 Cal.App.4th 981, 994 [concluding defendant forfeited claim that sentence constituted cruel and unusual punishment based in part on the fact that he suffered from mental impairments and intoxication at time of the offense because "[t]hese are the kinds of issues that should have been raised in the trial court where the trial judge, having heard all of the evidence, would be in a position to assess the validity of [defendant's] claims for impairment and make assessments as to their impact, if any, on the constitutionality of the sentence in this case"]; *Norman*, *supra*, 109 Cal.App.4th at pp. 229-230.)[30]

---

[29]    We reject Reed's claim that defense counsel "impliedly raised" Reed's cruel and unusual punishment claim in the trial court by asking family members of the victim to support the dismissal of the special circumstances allegations against Reed at sentencing.

[30]    We reject Reed's contention that his claim is reviewable as a "question of law" under section 1259 "without exception having been taken in the trial court." As in *Norman*, Reed's cruel and unusual punishment claim is "fact specific," and Reed was therefore required to raise it in the trial court. (*Norman*, *supra*, 109 Cal.App.4th at p. 229.)

6. *Reed has not demonstrated that he would have received a more favorable result if his trial counsel had raised his claim that the trial court's imposition a sentence of life without the possibility of parole constituted cruel and unusual punishment under the federal and state constitutions*

Reed contends that his trial counsel rendered ineffective assistance in failing to raise the claim that the trial court's imposition of a sentence of life without the possibility of parole constitutes cruel and unusual punishment under the federal and state constitutions.

a. *The law governing ineffective assistance of counsel*

To establish ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was deficient and that it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) A reasonable probability is one that is "sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) A court may reject a claim of ineffective assistance of counsel if it finds either that counsel's performance was reasonable, or that the defendant has failed to demonstrate prejudice. (*Id.* at p. 687.)

b. *Reed has not demonstrated a reasonable probability that he would have received a more favorable result if his trial counsel had raised a claim of cruel and unusual punishment under the federal Constitution*

The Eighth Amendment of the federal Constitution (applicable to the states through the Fourteenth Amendment) prohibits the infliction of "cruel and unusual punishment." "[I]t is now firmly established that '[t]he concept of proportionality is central to the Eighth Amendment,' and that '[e]mbodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and

56

proportioned to [the] offense." [Citation.]' [Citations.]" (*In re Coley* (2012) 55 Cal.4th 524, 538.)

"In *Tison,* the [United States Supreme Court] held that the Eighth Amendment does not prohibit as disproportionate the imposition of the death penalty on a defendant convicted of first degree felony murder who was a 'major participant' in the underlying felony, and whose mental state is one of 'reckless indifference to human life.' (*Tison*, *supra*, 481 U.S. at p. 158 & fn. 12.)" (*Estrada*, *supra*, 11 Cal.4th at p. 575.)

The jury found Reed guilty of murder, based on a felony-murder theory. In addition, by finding the robbery and burglary special circumstance allegations to be true, the jury found that Reed was a "major participant" in the underlying felonies, and that he acted with "reckless indifference to human life." These special circumstances findings are based on substantial evidence. (See pt. III.B.4., *ante*.)[31] Because even the imposition of the death penalty would not violate the Eighth Amendment's proscription on cruel and unusual punishment under these circumstances (*Tison*, *supra*, 481 U.S. at p. 158 & fn. 12), it is clear that there is no reasonable probability that Reed would have received a sentence of less than life without the possibility of parole if his defense counsel had raised a claim of cruel and unusual punishment under the federal constitution in the trial court.

---

[31] Reed does not contend that the trial court would have been free to ignore the jury's special circumstance findings in ruling on a cruel and unusual punishment motion. In any event, even assuming, without deciding, that a trial court has such authority, we see no reasonable probability that the trial court would have done so if Reed's counsel had presented his Eighth Amendment claim to the court.

c.      *Reed has not demonstrated a reasonable probability that he would have received a more favorable result if his trial counsel had raised a claim of cruel and unusual punishment under the state Constitution*

The California Constitution states that "cruel or unusual punishment may not be inflicted . . . . "  (Cal. Const., art. I., § 17.)

In *People v. Gonzales* (2012) 54 Cal.4th 1234, 1300, our Supreme Court summarized the manner by which a court must evaluate an as applied claim of cruel or unusual punishment under the state Constitution:

> " 'To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts.  The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities.  ([*Dillon*, *supra*,] 34 Cal.3d 441, 479.)  If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' (*ibid.*), so that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' [Citation.]"

In considering the circumstances of the offenses, we begin by noting that, viewed in the abstract, first degree special circumstance murder is perhaps the most serious offense under California law.  (Accord *Dillon*, *supra*, 34 Cal.3d at p. 479 ["when it is viewed in the abstract robbery-murder presents a very high level of such danger [to society], second only to deliberate and premeditated murder with malice aforethought"].)

58

While the circumstances of the murder in this case with respect to Reed are mitigated to some extent by the fact that he did not commit the actual killing, the fact remains that Reed's acts facilitated the brutal killing of a vulnerable elderly victim in her own home. Further, with respect to motive, we strongly disagree with Reed's contention that "[t]o be sure, there was no evidence whatsoever suggesting that force was ever planned or intended or that [Hayes and Reed] intended to take property from Ms. Cothron's person, i.e. that anything other than a theft was planned." Reed himself told law enforcement officers that Hayes had a knife in his hand as he was hiding behind the front door while Reed used a ruse to get the victim to open the door in order to facilitate Hayes's entry. This plainly constitutes evidence that Reed knew that Hayes intended to take property by force from the victim.

In considering other circumstances of the charged offenses, Reed also admitted to law enforcement officers that he looked for things to steal from the victim's residence while he watched Hayes strangling the victim, helped Hayes steal items from the residence after the attack, failed to summon any assistance for the victim notwithstanding his knowledge that the victim had been seriously injured, helped dispose of evidence of the crimes, and enjoyed the fruits of the robbery in Mexico for several days after the incident. Thus, while the circumstances of the offense in this case as to Reed are not as aggravated as in some special circumstance murders, Reed participated extensively in a series of crimes with no regard for the victim's life, in order to obtain the victim's property, and his participation facilitated the brutal murder of a vulnerable victim. In short, the circumstances of the offense do not support the conclusion that there is a reasonable probability that Reed would

59

have received a more favorable result if his trial counsel had raised his cruel and unusual punishment claim under the state Constitution.

With respect to Reed's personal characteristics, although Reed was relatively young at the time of the charged offenses (20 years of age), he was not a minor.  California courts have observed that the distinction between the sentencing of juveniles and those who have committed crimes after reaching the age of 18 is of great significance.  (See, e.g., *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 (*Argeta*).)  The *Argeta* court stated:

> "[Argeta's] counsel argues that since the crime was committed only five months after Argeta's 18th birthday the rationale applicable to the sentencing of juveniles should apply to him.  We do not agree.  These arguments regarding sentencing have been made in the past, and 'while drawing the line at 18 years of age is subject to the objections always raised against categorical rules, [that] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.]  Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood.  Such arguments would have no logical end, and so a line must be drawn at some point." (*Id*. at p. 1482.)

With respect to Reed's prior criminality, notwithstanding his relative youth, before committing the charged offenses, Reed suffered convictions for offenses committed on three separate occasions.  One of these convictions was a strike, for a robbery.  In addition, at the time of the charged offenses, Reed was on a grant of formal probation in two separate cases.

60

The record does contain some evidence that Reed has cognitive and emotional difficulties.  At sentencing, Reed offered a psychological evaluation that reported that Reed's general functioning, both in verbal and nonverbal areas, appeared to be in the lowest 10 percent of the population.  The evaluation also noted that Reed was an "intellectually and emotionally limited individual who would be easily influenced by those around him," and that Reed had "[begun] using drugs and alcohol at a very early age."  However, when considered against the weight of the other factors reviewed above, we cannot say that there is a reasonable probability that the trial court would have concluded that a sentence of life without the possibility of parole sentence was " 'grossly disproportionate to the defendant's individual culpability' (*ibid.*), so that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity." ' "  (*Gonzales*, *supra*, 54 Cal.4th at p. 1300.)

Nor are we persuaded by Reed's argument that *Dillon*, *supra*, 34 Cal.3d 441 compels a different result.  To begin with, as this court has previously observed, "*Dillon's* application of a proportionality analysis to reduce a first degree felony-murder conviction must be viewed as representing an exception rather than a general rule.  The *Dillon* majority on this point (Mosk, J., Bird, C.J., Kingsley, J., Reynoso, J.) itself recognized the exceptional nature of its result."  (*People v. Munoz* (1984) 157 Cal.App.3d 999, 1014.)

"*Dillon*, involved a very immature 17-year-old with no prior criminal record.  He engaged with companions in a foolish raid on a marijuana field which was guarded by an armed man.  The defendant panicked and shot the guard after he heard shots and then saw the guard pointing a gun at him.  Both the jury and the court appeared to view the sentence as excessive with respect to that defendant."  (*People v. Bonillas* (1989) 48 Cal.3d 757, 798-

61

799.)  "The *Dillon* court was persuaded to reduce defendant's first degree murder conviction to second degree for several reasons:  (1) the jury was reluctant to apply the felony-murder rule to the facts of that case; (2) defendant was an unusually immature youth and did not foresee the risk he was creating; (3) defendant had had no prior trouble with the law; and (4) only petty chastisements were handed out to the six other youths who participated with defendant in the same offenses.  (*People v. Dillon*, *supra*, 34 Cal.3d at pp. 487-488.)" (*People v. Thompson* (1994) 24 Cal.App.4th 299, 305-306.)

Unlike Dillon, Reed was not a minor, and did not lack a criminal record.  Reed did not commit the crimes charged while in a panic.  Rather, Reed facilitated a home invasion robbery of an unarmed elderly woman.  There is no evidence that Reed's jury was reluctant to apply the felony-murder rule in this case.  On the contrary, Reed's jury found that he was a major participant in the underlying felonies and that he acted with reckless indifference to human life.

In short, unlike *Dillon*, this is *not* a case in which the disproportionate nature of the defendant's sentence "is manifest on the record before us—as it was to the triers of fact . . . ."  (*Dillon*, *supra*, 34 Cal.3d at p. 450.)  Accordingly, although a sentence of life without parole is a harsh one for a defendant who did not commit the murder, the law of felony murder in California clearly calls for the imposition of such a sentence under the circumstances of this case.  We conclude that Reed has not demonstrated a reasonable probability that he would have received a more favorable result if his trial counsel had raised a claim of cruel and unusual punishment under the state Constitution.

IV.

DISPOSITION

The judgment is affirmed.


                                                                        AARON, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.