[No. B074314. Second Dist., Div. Seven. Apr. 20, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
SEKOU KWANE THOMPSON, Defendant and Appellant.

COUNSEL

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Robert F. Katz and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

JOHNSON, J.—

FACTS AND PROCEEDINGS BELOW

This is an appeal after remand following a prior decision of this court whereby we instructed the trial court to resentence the defendant either to 25 years to life or to life without possibility of parole and to stay the other sentence. On remand, the trial court sentenced defendant to life without possibility of parole and stayed the 25 years to life sentence. We affirm.

The discussion of the facts comes from our previous opinion in *People* v. *Thompson* (1992) 7 Cal.App.4th 1966, 1969-1970 [10 Cal.Rptr.2d 15].

"It was about 11:30 p.m., July 3, 1988, when Lisa Lee and her two-year-old son Dionsa returned home after an evening at grandmother's house. Lisa gave Dionsa a bath and brought him to his bedroom—the front bedroom, closest to the street. The lights were on and only thin curtains covered the two windows. By now it was almost midnight. Dionsa, naked from his bath, was on his bed jumping up and down. Lisa was reaching for her son's pajamas, her side to the windows, when she heard the window break. She looked at the window and saw a second 'cocktail'—a 'fireball'—fly into the room and roll under the bed. The bed went up in flames and she heard her 'little boy screaming 'cause he couldn't get off the bed.' Dionsa was burning from the neck down. He jumped off the end of the bed and ran into the hall. Lisa ran after him, tripped him, and by patting him and lying on top of him, put out the flames. With her boyfriend's help, she carried Dionsa outside. He was 'still sizzling'—you could hear it.

"Paramedics transported Dionsa to Martin Luther King Hospital. After a few hours he was transferred to the UCLA Burn Center and then, after a few days, to the burn institute in Boston. He died there on July 14.

"About a week later, on July 19, 1988, appellant confessed to aiding and abetting two friends who had filled two 40-ounce beer bottles with gasoline, inserted rag wicks, ignited them, and threw them through the victim's bedroom window." (*People* v. *Thompson, supra,* 7 Cal.App.4th at p. 1969.)

A jury convicted the defendant of first degree murder (Pen. Code, § 187), igniting a destructive device causing death (Pen. Code, § 12310, subd. (a)), and igniting a destructive device causing bodily injury (Pen. Code § 12310, subd. (b)).[1] On appeal we affirmed the judgment of the trial court in all respects except for the sentence imposed of concurrent terms of 25 to life under section 187 and life without possibility of parole under section 12310. We remanded the case for resentencing under either section 187 or section 12310 pursuant to section 654.

On remand the trial court exercised discretion in sentencing defendant to the maximum penalty allowed in this case, life without possibility of parole (LWOP). On appeal, defendant now contends: (1) the sentence of LWOP is cruel or unusual punishment under the facts of this case pursuant to the California Constitution, article I, section 17, and (2) the sentencing judge abused his discretion in sentencing defendant to LWOP rather than 25 years to life under section 187. We hereby affirm the sentence of LWOP as not being cruel or unusual under the facts of this case, nor did the trial court abuse its discretion in imposing the harsher sentence.

---

[1]Unless otherwise indicated all further section references are to the Penal Code.

DISCUSSION

I.  *Life Without Possibility of Parole Is Not Cruel or Unusual
Punishment Under the Facts of This Case.*

■ It is well settled a statutory punishment may violate the constitutional prohibition against cruel and unusual punishment not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed. (*Enmund* v. *Florida* (1982) 458 U.S. 782, 788 [73 L.Ed.2d 1140, 1145-1146, 102 S.Ct. 3368].) In the case of *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], the Supreme Court held a punishment may violate the California constitutional prohibition "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id.* at p. 424.)

In holding an indeterminate life-maximum sentence for second offense indecent exposure was unconstitutionally excessive, the *Lynch* court promulgated a three-pronged analysis for determining whether a particular punishment is "so disproportionate" for a particular crime: (1) the nature of the offense and the offender, with particular regard to the degree of danger which both present to society; (2) a comparison of the challenged penalty with the punishment prescribed in the same jurisdiction for other more serious offenses; (3) a comparison of the challenged penalty with punishment prescribed for the same offense in other jurisdictions. (8 Cal.3d at pp. 425-427; accord, *In re Grant* (1976) 18 Cal.3d 1, 8-9 [132 Cal.Rptr. 430, 553 P.2d 590]; *In re Rodriguez* (1975) 14 Cal.3d 639, 647 [122 Cal.Rptr. 552, 537 P.2d 384]; *People* v. *Wingo* (1975) 14 Cal.3d 169, 175 [121 Cal.Rptr. 97, 534 P.2d 1001]; *In re Foss* (1974) 10 Cal.3d 910, 919-920 [112 Cal.Rptr. 649, 519 P.2d 1073].)

Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. In appropriate cases, some leeway or experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty "out of all proportion to the offense," i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment. (*In re Lynch, supra,* 8 Cal.3d at pp. 423-424.) Implicit in the *Lynch* holding is the notion that the Legislature is best suited to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone.

Given this deference to the Legislature, defendant is wise not to challenge the sentence imposed by the Legislature for those who are convicted under section 12310.[2] That branch has determined this crime is particularly dangerous to human life and those who are convicted of causing death by igniting a destructive device should be sure to suffer a penalty separate and apart from the murder statutes. The penalty challenged herein is calculated to advance a critically important social policy for the protection of the public at large, i.e., the deterrence of a particularly egregious type of life-endangering criminal conduct. (*People* v. *Isitt* (1976) 55 Cal.App.3d 23, 31 [127 Cal.Rptr. 279]; *People* v. *Laursen* (1972) 8 Cal.3d 192, 198 [104 Cal.Rptr. 425, 501 P.2d 1145].)

Instead, defendant argues the imposition of LWOP is cruel or unusual punishment under the facts of this particular case. In support of his argument, defendant relies on the case of *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], which expanded the first prong of the *Lynch* analysis of crimes and punishment. With respect to "the nature of the offense" prong, courts are to consider not only the offense in the abstract—i.e., as defined by the Legislature—but also "the facts of the crime in question." (*Id.* at p. 479, citing *In re Foss*, *supra*, 10 Cal.3d 910, 919.) This entails an examination of the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts. (34 Cal.3d at p. 479.)

Second, under *Dillon* the courts must also view "the nature of the offender" in the concrete rather than the abstract: although the Legislature can define the offense in general terms, each offender is necessarily an individual. (34 Cal.3d at p. 479) Therefore, the inquiry focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind. (*Ibid.*)

It is important to note *Dillon* and its progeny all deal with the felony-murder rule and how its application sometimes works very harsh results. In addition, several subsequent cases have viewed *Dillon*'s application of a proportionality analysis to reduce a first degree felony-murder conviction as representing an exception rather than a general rule. (*People* v. *Kelly* (1986)

---

[2]Section 12310 states in pertinent part: "(a) Every person who willfully and maliciously explodes or ignites any destructive device or any explosive which causes the death of any person is guilty of a felony, and shall be punished by imprisonment in the state prison for life without the possibility of parole."

183 Cal.App.3d 1235, 1247, fn. 1 [228 Cal.Rptr. 681]; see also *People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1014 [204 Cal.Rptr. 271]; *People* v. *Laboa* (1984) 158 Cal.App.3d 115, 122 [204 Cal.Rptr. 181]; *People* v. *Harpool* (1984) 155 Cal.App.3d 877, 889-890 [202 Cal.Rptr. 467].)

While the rationale of the *Dillon* decision is applicable, the facts of that case are readily distinguishable from the case at bar. The *Dillon* court was persuaded to reduce defendant's first degree murder conviction to second degree for several reasons: (1) the jury was reluctant to apply the felony-murder rule to the facts of that case; (2) defendant was an unusually immature youth and did not foresee the risk he was creating; (3) defendant had had no prior trouble with the law; and (4) only petty chastisements were handed out to the six other youths who participated with defendant in the same offenses. (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 487-488.)

None of these mitigating circumstances present in the *Dillon* case and which might serve to reduce defendant's sentence are present in the case at bar. The only mitigating factor in the defendant's favor here was his youth, but there was no evidence defendant was an unusually immature youth and did not foresee the risk he was creating. By contrast, the final result was the natural and likely consequence of the defendant's assistance and facilitation of the underlying crime. The probability a particular house is occupied at midnight and that grave bodily harm is likely to follow from the defendant's conduct is substantial and undermines defendant's argument that he is not as culpable as the two who actually went up to the house. Defendant has had minor skirmishes with the law, albeit as a minor, and there is no evidence the jury showed any reluctance to convict him under section 12310. Finally, defendant received the same penalty which his two partners in crime received, which we think is consistent with the facts of this case.

Defendant contends his sentence should be reversed under the second prong of the *Lynch* test which involves a comparison of the questioned punishment with punishments imposed within the same jurisdiction for offenses which may be deemed more serious than that for which the questioned punishment is imposed. While such a comparison is particularly striking when a more serious crime is punished less severely than the offense in question, it remains instructive when the latter is punished as severely as a more serious crime. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 487 and fn. 38.)

In support of this argument defendant cites the fact he would only have been sentenced to 25 years to life if he had been convicted of intentionally killing someone with deliberation and premeditation and without a finding of

special circumstances. (§ 190.) But this is not an uncommon situation in the law. As noted above, the legislative determination has been made that the crime involved in this case is a more serious crime than premeditated murder and deserves the augmented penalty associated with it. The use of destructive devices, molotov cocktails in this instance, which can inflict indiscriminate and multiple deaths, marks defendant as a greater danger to society than a person who premeditates the murder of a single individual.

Defendant's same argument could be made for the two other crimes associated with LWOP: kidnapping for the purpose of ransom, extortion or robbery with bodily harm (§ 209), or attempted or actual train wrecking (§§ 218, 219). In the case of *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207 [277 Cal.Rptr. 382], the defendant made a similar argument which was rejected by this court. In that case we held the statutory scheme classifying aggravated kidnapping for ransom as a crime warranting imposition of life without possibility of parole on an aider and abettor where the victim dies or suffers bodily injury did not violate due process, despite the contention the trial court's choice of crime to be used as base term in sentencing would subject a defendant to greater sentence than an aider and abettor sentenced on basis of conviction for second degree felony murder committed during aggravated robbery. (*Id.* at pp. 1238-1239). We also held the sentence of LWOP was not disproportionate to the crime of aggravated kidnapping for ransom, and therefore not cruel or unusual punishment under either the federal or state Constitutions. (*Id.* at p. 1237; see also *People* v. *Castillo* (1991) 233 Cal.App.3d 36 [284 Cal.Rptr. 382], rehg. den. and mod.) Even if a death does not occur during these crimes the Legislature has determined they evidence such a flagrant disregard for the value of human life the perpetrator deserves a sentence of life without possibility of parole. That is the case here. The fact a two-year-old boy was killed is testament to the dangerousness of the crime, and makes the whole situation even more of a tragedy.

## II. *Sentence of Life Without Possibility of Parole Did Not Manifest an Abuse of Discretion.*

In our prior opinion in this case, we remanded to the trial court to determine which punishment, 25 years to life under count I, *or* LWOP under count III, was the more appropriate; to impose that punishment; and to stay the other punishment pursuant to section 654. (*People* v. *Thompson, supra,* 7 Cal.App.4th 1966, 1983.) ▇▇ We now consider whether the fact the sentencing judge chose the more severe penalty in this case manifested an abuse of discretion.

▇▇ Section 654 mandates that "[a]n act or omission which is made punishable in different ways by different provisions of the code may be

punished under *either* of such provisions, but in no case can it be punished under more than one." The legislative intent is to prevent double punishment whether the crime is defined in the Penal Code or any other law of the state that properly defines a crime. (*People* v. *Williams* (1962) 207 Cal.App.2d Supp. 912, 919 [24 Cal.Rptr. 922].) It is well settled the appropriate procedure *at the appellate level* is to eliminate the effect of the judgment as to the less severely punishable offense insofar as penalty alone is concerned, if the trial court did not exercise its discretion under section 654. (*People* v. *McFarland* (1962) 58 Cal.2d 748, 762 [26 Cal.Rptr. 473, 376 P.2d 449]; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 20 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Logan* (1953) 41 Cal.2d 279, 290-291 [260 P.2d 20]; *People* v. *Knowles* (1950) 35 Cal.2d 183, 188 [217 P.2d 1].)

On the other hand, the weight of authority is that the trial court itself has the discretion in sentencing on more than one count to select the count on which sentence is to be carried out, even if it is a count carrying a lesser penalty, and to stay sentence on the remaining counts as to which sentence is imposed. (*People* v. *Barela* (1983) 145 Cal.App.3d 152, 156 [193 Cal.Rptr. 257]; *People* v. *Avila* (1982) 138 Cal.App.3d 873, 879 [188 Cal.Rptr. 754]; *People* v. *Bradley* (1981) 115 Cal.App.3d 744, 753 [171 Cal.Rptr. 487]; *People* v. *Mendevil* (1978) 81 Cal.App.3d 84, 89 [146 Cal.Rptr. 65]; *People* v. *Wesley* (1970) 10 Cal.App.3d 902, 911 [89 Cal.Rptr. 377]; see also Overland, The Complete Sentencing Handbook (1986) pt. I, ch. XIII, p. 32.)

■ Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].)

■ The trial court did not, nor do we, accept the fact that defendant was the least culpable of the three defendants. From the trial court's remarks at sentencing, it is apparent the judge found all three defendants were equally to blame and implicitly exercised its discretion based on that premise. This is not a situation where an aider and abettor had no idea of the criminal scheme he joined. Nor was it a criminal enterprise where violence and death were unexpected. The defendant here drove his two friends to one gas station to fill up the beer bottles and then another station to get some matches. He then drove them to the victim's house where he waited for their return. He knew the purpose of the endeavor—to firebomb a private residence at midnight when it surely would be occupied. This is very different

from a robbery gone awry. Here massive destruction was the very goal of the enterprise in which defendant knowingly joined and played such a key role.

We do not read the record of the sentencing hearing to evidence any misunderstanding or mistaken assumption. The court's statement "we don't know if defendant was the least culpable" was evidence of the court's exercise of judicial discretion. For anyone to consider defendant the "least culpable," one would have to assume both of the other defendants threw a bomb at the house, as opposed to one of them handing the bombs to the other, who threw them at the house. If the latter situation were true, then defendant would not be the least culpable but would be as culpable as the other defendant who did not actually throw a bomb in the house. Indeed, given his heavy involvement in the several stages leading up to the actual throwing of the molotov cocktails, it is difficult to say defendant was less culpable than the two who approached the house and pitched the "cocktails" through the window. Taking into account the extraordinarily dangerous nature of the crime, defendant's level of participation and state of mind, the sentencing court chose to exercise its discretion in favor of the maximum penalty in this case and we think properly so.

#### DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

Appellant's petition for review by the Supreme Court was denied July 14, 1994.