Filed 10/10/22  P. v. Thompson CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B313182 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A648471) |
| v. | |
| SEKOU KWANE THOMPSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Allen J. Webster, Jr., Judge.  Affirmed.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Daniel C. Chang and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Sekou Kwane Thompson appeals from the superior court's order after an evidentiary hearing denying his petition for resentencing under Penal Code section 1172.6.[1]  He argues substantial evidence did not support the superior court's ruling he could be convicted under current law of murder as a direct aider and abettor and as a major participant in a felony murder. We conclude substantial evidence supported the former ruling. Therefore, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *A Jury Convicts Thompson of First Degree Murder*

Late one evening in July 1988 Lisa Lee and her two-year-old son Dionsa returned home after spending the evening with Lee's mother.  (*People v. Thompson* (1992) 7 Cal.App.4th 1966, 1969 (*Thompson I*).)  Lee gave Dionsa a bath and brought him to his bedroom, where he jumped up and down on the bed.  (*Ibid*.) Close to midnight, Lee reached for Dionsa's pajamas and heard the bedroom window break.  (*Ibid*.)  She looked at the window and saw a "fireball" fly into the room and roll under the bed. (*Ibid*.)  The bed went up in flames, and the flames engulfed

---

[1]    Statutory references are to the Penal Code.  At the times Thompson filed his petition and the superior court denied it, section 1172.6 appeared at section 1170.95.  Effective June 30, 2022, the Legislature renumbered section 1170.95 as section 1172.6 without making substantive changes to the statute.  (Stats. 2022, ch. 58, § 10.)  For simplicity, we refer to section 1172.6.

Dionsa.  (*Ibid*.)  Two weeks later Dionsa died from his injuries.  (*Ibid*.)  Lee suffered minor injuries.

The People filed a multicount information against Thompson, Leonard Nixon, and Anthony Snead.  (*Thompson I*, *supra*, 7 Cal.App.4th at p. 1970.)  Detective Joe Callian of the Los Angeles Police Department investigated the arson and Dionsa's death.  Detective Callian testified at a preliminary hearing that he listened in on a phone conversation Lee's sister Lana had with several individuals who implicated Snead and Thompson.  Detective Callian went to Snead's house where he found Snead and Thompson, both of whom agreed to go to the police station with Detective Callian.

After Detective Callian read Snead and Thompson their rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694], Snead told Detective Callian that on the evening of the incident he and Thompson met with Nixon in a parking lot and "had a conversation about putting in some work for the home boy."  Snead explained "putting in some work" meant "to cocktail or firebomb Lana or Lisa's house."  Nixon told Snead and Thompson that he would "go along with them," and Thompson drove them to a gas station.  At the gas station, Nixon filled two or three 40-ounce beer bottles with gasoline while Thompson put air in the car's tires.  Snead or Nixon had found the bottles behind a house, and Nixon had "picked up some rags" from the same place.

Thompson told Detective Callian that he heard Snead and Nixon have a conversation about "cocktailing Lana or Lisa's house."  After Nixon "agreed to go," Thompson drove them to one gas station for gasoline, and then to another gas station for matches.  It is unclear from the record which of the three men got

the matches at the second gas station. Thompson told Detective Callian he then drove to Lee's house, while Nixon tore up the rags and stuffed them into the bottles. When they arrived, Thompson parked the car around the corner from the house, and Snead and Nixon got out of the car with the Molotov cocktails.[2] A "couple minutes later they came running back around the corner and got in the car," and Thompson drove away. Snead told Detective Callian that they targeted Lee because she had a gold chain that belonged to Snead's friend. Thompson told Detective Callian that he knew there was a motive for the attack.

A jury convicted Thompson of first degree murder (§ 187; count 1), exploding or igniting a destructive device causing death (former § 12310, now §18755, subd. (a); count 3), and exploding or igniting a destructive device causing bodily injury (former § 12309, now § 18750; count 4); the jury acquitted Thompson of arson causing great bodily injury (§ 451, subd. (a); count 2). (*Thompson I*, *supra*, 7 Cal.App.4th at p. 1970.) The trial court sentenced Thompson to prison for life without the possibility of parole for exploding or igniting a destructive device causing death, and concurrent terms of 25 years to life for first degree murder and seven years for exploding or igniting a destructive device causing bodily injury. (*Ibid*.) Thompson appealed, and this court affirmed the convictions, but directed the trial court to resentence Thompson on counts 1 and 3. (*Id*. at pp. 1974-1975.)

---

[2] A Molotov cocktail "is a bottle filled with a flammable liquid with a wick or rag which acts as a fuse to ignite [the] device." (*People v. Townsend* (2010) 182 Cal.App.4th 1151, 1155.) "The device is named after Vyacheslav Mikhaylovich Molotov (1890-1986), a Soviet statesman." (*State v. Gauthier* (2002) 73 Conn.App. 781, 787 [809 A.2d 1132, 1137].)

On remand the trial court sentenced Thompson to life without the possibility of parole for exploding or igniting a destructive device causing death and stayed execution of the sentence for first degree murder. This court affirmed. (*People v. Thompson* (1994) 24 Cal.App.4th 299, 303 (*Thompson II*).)

      B.     *This Court Grants Thompson's Request on Habeas To Vacate His Conviction for First Degree Murder; the People Accept a Conviction for Second Degree Murder*

Thompson filed a petition for writ of habeas corpus following the Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155, which held an aider and abettor may not be convicted of first degree murder under the natural and probable consequences doctrine. (See *In re Thompson* (Sept. 5, 2017, B270387) [nonpub. opn.] [2017 WL 3866785] (*Thompson III*).) Thompson argued that his convictions for first degree murder and exploding or igniting a destructive device causing death and bodily injury had to be vacated because the trial court erroneously instructed the jurors that they could find him guilty of those crimes under the natural and probable consequences doctrine and the record did not establish beyond a reasonable doubt his convictions were based on a legally valid theory.

We granted the petition on Thompson's conviction for first degree murder, but denied it on the convictions for exploding or igniting a destructive device causing death and bodily injury. We stated the People could accept a reduction of the conviction for first degree murder to second degree murder or retry Thompson for first degree murder under a legally valid theory. (*Thompson III*, *supra*.) The People elected to accept a reduction of the murder conviction, and the trial court sentenced Thompson to terms of 15 years to life for second degree murder and a

concurrent term of seven years for exploding or igniting a destructive device causing bodily injury. The court also stayed execution of sentence on Thompson's conviction for exploding or igniting a destructive device causing death.

C.   *The Superior Court Denies Thompson's Petition Under Section 1172.6*

In January 2019 Thompson filed a petition for resentencing under section 1172.6. Thompson alleged that he was convicted of first degree murder under a theory of felony murder or murder under the natural and probable consequences doctrine and that he could not now be convicted of murder because of changes to sections 188 and 189. The trial court summarily denied the petition. Thompson appealed from the order denying his petition, and we reversed the order and directed the superior court to appoint counsel for Thompson and to comply with the procedure under section 1172.6. (*People v. Thompson* (Jan. 13, 2020, B296039) [nonpub. opn.] [2020 WL 131866, at p. 2].)

The superior court appointed counsel for Thompson and set an evidentiary hearing. The People argued Thompson was not eligible for relief under section 1172.6 because Thompson could still be convicted of murder under sections 188 and 189. The People argued Thompson acted with implied malice in directly aiding and abetting Dionsa's murder, was a major participant in the arson that caused Dionsa's death, and acted with reckless indifference to life. The prosecutor asked the court to mark as Exhibit 1 a compact disc previously provided to counsel for Thompson, which purportedly contained "the entire reporter's transcripts, as well as the entire clerk's transcripts," from Thompson's trial. Counsel for Thompson acknowledged receiving the files from the People, and the court received the files into evidence. It turned out, however, the compact disc contained only

6

part of the preliminary hearing testimony, including Detective Callian's testimony, and this court's opinions in *Thompson I* and *Thompson II.*

After supplemental briefing and a hearing, the superior court denied Thompson's petition and found he could be convicted of murder under sections 188 and 189 as amended. Regarding direct aiding and abetting murder under section 188, the court found Thompson acted with implied malice because he shared a "common purpose" with the other two men "to firebomb this house at about 11:30 at night," drove Snead and Nixon to collect the ingredients and materials for the bombs, drove Snead and Nixon to Lee's house, and parked around the corner because he knew Snead and Nixon planned to firebomb it. The court said Thompson's conduct and knowledge of the planned attack satisfied the physical component of implied malice because "anybody 10 years old or older would know if you throw a firebomb in the house, somebody is going to get injured." The court found the evidence satisfied the mental component of implied malice because, "when you throw a firebomb in anybody's house, in anybody's kind of close spaces, mentally you understand that that's dangerous to the particular person's life." The court stated that the time of the attack—late at night when "most people are at home and in their beds sleeping"—further suggested "this is a little bit more serious than the fact that you just happened to be at the wrong place at the wrong time with some of your buddies."

Regarding liability for felony murder under section 189, the court found Thompson was a major participant in the underlying arson and acted with reckless indifference to human life. Specifically, the court found Thompson was present during the planning stages, knowingly agreed to participate, helped obtain the supplies for the firebombs, was aware of the danger posed by

"throwing a Molotov cocktail in somebody's house . . . at 11:30 at night," never attempted to prevent Snead and Nixon from throwing the firebombs, and never took any action to assist the victims or otherwise minimize the risk created by his and his companions' actions. Thompson timely appealed from the order denying his petition.

## DISCUSSION

Thompson argues substantial evidence did not support the superior court's finding he could be convicted under section 188 for directly aiding and abetting murder. Thompson also argues that his acquittal on the count for arson precluded the superior court from finding he was a major participant under section 189 and that substantial evidence did not support the court's finding Thompson had a reckless indifference to life. Because we conclude substantial evidence supported the court's finding Thompson could be convicted of murder as a direct aider and abettor, we do not consider Thompson's other arguments.[3]

_____

[3] Thompson does not contend the superior court erred in relying "on the factual summary as stated in the prior appellate decision affirming the conviction." (Compare *People v. Flores* (2022) 76 Cal.App.5th 974, 988 [superior court erred at the prima facie stage in relying on an appellate opinion that was not part of the record of conviction to find the petitioner was ineligible for relief] with *People v. Harris* (2021) 60 Cal.App.5th 939, 953-954 [in postconviction proceedings including under section 1172.6, "statements from prior appellate opinions are admissible as reliable hearsay even if they would not be admissible at trial"]; see also § 1172.6, subd. (d)(3) [superior court may rely on a prior appellate opinion for "the procedural history of the case"].) Thompson states that any error by the superior court in relying

A. *Senate Bill No. 1437 and the Section 1172.6 Petition Procedure*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957). As amended by Senate Bill No. 1437, section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e). The latter provision requires the People to prove specific facts relating to the defendant's individual culpability: The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the actual killer, with the intent to kill assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, "as described in subdivision (d) of Section 190.2," the felony-murder special-circumstance provision. (*Strong*, at p. 708; see *Gentile*, at pp. 842-843.)

Senate Bill No. 1437 also authorized, through section 1172.6, an individual convicted of felony murder or murder based

---

on the facts in our prior opinion "could only be harmless because the preliminary hearing testimony, which is admissible, was consistent with the facts summarized" in our opinion.

on the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of the changes in Senate Bill No. 1437 to the definitions of the crime.  (See *People v. Strong, supra,* 13 Cal.5th at p. 708; *People v. Lewis, supra,* 11 Cal.5th at p. 957; *People v. Gentile, supra,* 10 Cal.5th at p. 843.)  As the Supreme Court clarified in *Lewis,* and as amendments by Senate Bill No. 775 made explicit, if a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner if requested.  (*Lewis,* at pp. 962-963; see § 1172.6, subds. (b)(1)(A), (3).)  The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief.  (§ 1172.6, subd. (c).)

Where, as here, the petitioner has made the requisite prima facie showing he or she is entitled to relief under section 1172.6, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.  (§ 1172.6, subd. (d)(1).)  At that hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony.  (§ 1172.6, subd. (d)(3).)  The petitioner and the prosecutor may also offer new or additional evidence.  (*Ibid.*; see *Gentile, supra,* 10 Cal.5th at pp. 853-854.)

On appeal from an order denying a petition under section 1172.6, we review the trial court's factual findings for substantial evidence.  (*People v. Richardson* (2022) 79 Cal.App.5th 1085,

1090; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) We "'"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.'" [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; see *Richardson*, at p. 1090.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57; see *People v. Nieber* (2022) 82 Cal.App.5th 458, 476.)

B. *Substantial Evidence Supported the Superior Court's Finding Beyond a Reasonable Doubt Thompson Was Ineligible for Relief Under Section 1172.6*

1. *Aiding and Abetting Implied Malice Murder*

"A person who aids and abets the commission of a crime is culpable as a principal in that crime." (*Gentile, supra,* 10 Cal.5th at p. 843; see *People v. Powell* (2021) 63 Cal.App.5th 689, 710.) "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct

11

perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'" (*Gentile*, at p. 843.) Thus, a direct aider and abettor's guilt is "'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.'" (*Powell*, at p. 710; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) An "'aider and abettor's mental state must be at least that required of the direct perpetrator,' and when the crime is murder, the 'aider and abettor must know and share the murderous intent of the actual perpetrator.'" (*People v. Maciel* (2013) 57 Cal.4th 482, 518; see *People v. Offley* (2020) 48 Cal.App.5th 588, 596.)

"Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2)). When a person directly perpetrates a killing, it is the perpetrator who must possess such malice. [Citations.] Similarly, when a person directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 844.) "For implied malice, the intent requirement is satisfied by proof that the actual perpetrator '"knows that his conduct endangers the life of another and . . . acts with conscious disregard for life."' [Citation.] Therefore, notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or

12

her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, at p. 850.)

Implied malice has "'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life."'" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Thus, to be culpable as a direct aider and abettor of implied malice murder, the accomplice "'must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.'" (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 501 (*Valenzuela*); accord, *People v. Powell, supra*, 63 Cal.App.5th at p. 713; see *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 588 ["the aider and abettor's actus reus 'includes whatever acts constitute aiding the commission of the life endangering act'"], review granted July 27, 2022, S274792.) The mental component of implied malice murder requires that the defendant ""'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life."'" (*Chun*, at p. 1181.) "'The aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life.'" (*Valenzuela*, at p. 501; see *Powell,* at p. 714.) "The requisite intent is a subjective one—the defendant must have '*actually appreciated* the risk involved.'" (*Valenzuela*, at p. 501.) "'In short, implied malice [murder] requires a defendant's awareness of engaging in conduct that endangers the life of another.'"

13

(*People v. Cravens* (2012) 53 Cal.4th 500, 507; accord, *People v. Palomar* (2020) 44 Cal.App.5th 969, 974.)

"Implied malice can exist even if the act results in an accidental death.  [Citation.]  And like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*Valenzuela, supra*, 73 Cal.App.5th at p. 502.)  Indeed, the "'very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act.'"  (*Ibid.*; see *People v. Palomar, supra*, 44 Cal.App.5th at p. 977 [mental component of implied malice murder is ordinarily proven by the circumstances leading to the ultimate deadly result].)  "Among the circumstances courts have found relevant in determining whether malice may be inferred are the victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death." (*Valenzuela*, at p. 502.)

> 2.      *Substantial Evidence Supported the Superior Court's Finding Thompson Acted with Implied Malice*

Thompson argues substantial evidence did not support the physical or mental component required to convict him of aiding and abetting implied malice murder.  First, Thompson argues there was insufficient evidence he aided the commission of a life-endangering act because Molotov cocktails are not as life-endangering as pipe bombs.  But even if Thompson's premise is correct (which is doubtful), it does not follow that throwing Molotov cocktails at a house late at night is not life-endangering.  Indeed, a "'Molotov cocktail has no use other than as a weapon'" of destruction.  (*People v. Townsend* (2010) 182 Cal.App.4th 1151,

14

1155; see *United States v. Cruz* (2d Cir. 1974) 492 F.2d 217, 219 [Molotov cocktails "are objectively destructive" and "have no use besides destruction"]; *United States v. Ross* (5th Cir. 1972) 458 F.2d 1144, 1145 [Molotov cocktails are "not suited for some . . . innocent end"].)  A Molotov cocktail is a type of bomb that is ""*inherently dangerous*"" because it may wreak enormous havoc on persons and property and its "'victims are often unintended sufferers.'"  (*Townsend*, at p. 1155; see *People v. Morse* (1992) 2 Cal.App.4th 620, 646.)  As we stated in *Thompson II*, Molotov cocktails "can inflict indiscriminate and multiple deaths," and the nature of the crime committed here was "extraordinarily dangerous."  (*Thompson II*, *supra*, 24 Cal.App.4th at pp. 307, 309.)  Substantial evidence supported the superior court's finding Thompson aided the commission of a life-endangering act.

Second, Thompson argues there was insufficient evidence he acted with conscious disregard for human life.  Thompson contends that he did not know Snead and Nixon intended to throw the Molotov cocktails "into the house" and that, in part because he was only 18 years old at the time, he did not appreciate the risk created by their conduct.  And he argues the superior court erred in inferring Thompson "knew Snead and Nixon intended to use the gas-filled bottles the way they did."  Substantial evidence, however, supported that very inference.  Thompson knew the plan was to "cocktail" Lee's house and helped Snead and Nixon obtain the supplies they needed to carry out that plan, even making an extra stop for matches.  And as the superior court stated, Thompson's act of parking the car around the corner from Lee's house further supported the inference Thompson knew Snead and Nixon intended to throw the Molotov cocktails at Lee's house.  That Thompson might not have known

15

one or both of the firebombs would go through a window and into the house, as opposed to landing on the front porch or somewhere else next to the house, did not make throwing an ignited bottle of gasoline at the house any less dangerous to human life. (See *Mello v. DiPaulo* (1st Cir. 2002) 295 F.3d 137, 140 [Molotov cocktail thrown at approximately 4:30 a.m. at a porch in front of an apartment building caused a fire that killed two residents].)

Circumstantial evidence also supported the superior court's finding Thompson appreciated the risk caused by Snead's and Nixon's acts. (See *People v. Cravens*, *supra*, 53 Cal.4th at p. 511 [trier of fact "was entitled to infer [the defendant's] subjective awareness that his conduct endangered [the victim's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life"]; *People v. Palomar*, *supra*, 44 Cal.App.5th at p. 978 [same].) As the superior court observed, the attack occurred near midnight, when people are generally home and often asleep, which made Lee and anyone else in the house vulnerable. (See *Cravens*, at p. 509 [victim's vulnerability to attack supported finding of implied malice]; *Valenzuela*, *supra*, 73 Cal.App.5th at p. 502 [same].) And despite knowing Snead and Nixon firebombed Lee's home, Thompson did not seek assistance for the victims after Snead and Nixon returned to Thompson's car. (See *Cravens*, at p. 511 [defendant's failure to ascertain the victim's condition or to secure emergency assistance supported the mental component of implied malice].)

Thompson also had to know the Molotov cocktails Snead and Nixon threw would cause destruction—that was their only purpose—including injury and death. (See *People v. Townsend*, *supra*, 182 Cal.App.4th at pp. 1155-1156 ["courts have declared that unlawfully possessing bombs [like Molotov cocktails] in

16

neighborhoods or communities 'inherently involves a high probability of death'"]; *Thompson II*, *supra*, 24 Cal.App.4th at p. 308 [throwing Molotov cocktails is not "a criminal enterprise where violence and death [are] unexpected"]; see also *United States v. Honeycutt* (11th Cir. 1993) 8 F.3d 785, 787 ["[i]t is difficult to imagine a clearer illustration of the knowing creation of a substantial risk of death or serious bodily injury" than throwing "a Molotov cocktail at a structure" known to be occupied]; *United States v. Karlic* (9th Cir. 1993) 997 F.2d 564, 570 [bombing bank depository boxes in the early morning hours created a substantial risk of death or serious bodily injury because "neighboring residents were practically certain to be present" in an adjacent apartment complex].)  Thompson was over 18 when the crime occurred.  There was no evidence he had cognitive difficulties or would not have understood what is common knowledge:  Uncontrolled fire is inherently dangerous to human life.  While a defendant's age may influence his or her awareness "'of particular dangers posed by the nature of the crime'" (*People v. Harris* (2021) 60 Cal.App.5th 939, 960), Thompson's age alone did not undermine the superior court's finding beyond a reasonable doubt that Thompson knew and appreciated the risk that firebombing Lee's house endangered the life of others.

## DISPOSITION

The order is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.